[Crim. No. 3752. In Bank.—October 9, 1934.]

THE PEOPLE, Respondent, v. JAMES SYDNEY ROGAN,
Appellant.

Vincent W. Hallinan and William F. Herron for Appellant.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

SEAWELL, J.—The defendant was accused by an indictment returned against him by the grand jury of the county of Los Angeles with the commission of four separate crimes, to wit, murder of the first degree, robbery and two separate assaults with a deadly weapon with the intent to commit murder. Said accusations were set out in four counts, numbered 1, 2, 3 and 4, in the order above named. During the course of the trial, upon motion of the defendant, the two counts charging assault with a deadly weapon with intent to commit murder were dismissed. The jury returned a verdict of guilty of murder, without recommendation that the defendant be relieved of the death penalty, and it also found him guilty of first degree robbery, under the robbery count. The court thereupon pronounced its judgment, which imposed the death penalty upon said defendant, and also entered judgment upon the conviction of robbery, as provided by law. Defendant has appealed from both judgments of conviction.

In his statement of questions involved on the appeal, appellant presents and argues three, to wit: prejudicial misconduct on the part of the district attorney and the trial judge; insufficiency of the evidence to justify the verdict, and the refusal of the court to permit appellant's counsel to cross-examine certain witnesses called by the prosecution upon subjects which counsel characterizes as the most vital points in the testimony. The refusal of the court to rebuke opposing counsel upon each breach of orderly procedure committed by him, and the alleged indulgence of the trial court in adverse comment upon the procedure of counsel for the appellant, are also assigned and urged as grounds upon which a new trial should have been ordered, but which the trial court denied.

The crime was committed at an early hour on the morning of November 11, 1932, in a resort variously referred to in the testimony as a "night club", "gambling place" or "speak-easy", located at 2610½ West Seventh Street, city of Los Angeles. The place was conducted by Harvey Loren Crosby. Glen Fullmer was employed as a piano player; Homer Washburn was the bartender, and Mrs. Evelyn Daughney was the entertainer. Henry B. Minstrot, who had left the premises before the homicide was committed

conducted a black-jack game in a room of the establishment and divided the proceeds with the proprietor, Crosby.

At about the hour of 10 o'clock, on the night of November 10th, one R. D. McAllister, who was engaged in the illicit sale of liquor, and the defendant, Rogan, his companion, appeared at the door and sought admission into said club-rooms. Admission, in case the visitor was not personally known to the habitues of the club, seems to have been by card, which assured the man at the door that the party seeking admission was a person acceptable to the proprietor of the gaming house. Some slight delay was caused by investigating the identity of said McAllister and Rogan, but the matter was soon cleared up by the use of the 'phone and both were duly admitted. Rudolph G. Vejar, a deputy sheriff of the county of Los Angeles, was also among the persons present when the defendant and his companion, neither wearing coats, entered. McAllister immediately went into the gaming room and began gambling. Rogan played but a few hands, spending some time at the bar, where he consumed a number of drinks, principally beer. They left between 12 and 1 o'clock and returned at about 2 o'clock, wearing coats. At the time they entered Crosby and Washburn were seated at a card table in the gambling room, while Vejar, the deputy sheriff, was watching them play. Mrs. Daughney, who, a short time before the defendant and McAllister entered the second time, had returned to the club to regain her purse, which she had forgotten, was also present. As the two men entered the second time, one of them asked, "Where has the game gone?" They were informed that the game had closed but that the bar was open. It is a fact that the dealer of the black-jack game, Minstrot, had prior thereto left the club and taken the proceeds of the game with him. Upon being told that the game had closed, two shots were fired and McAllister and Rogan, with drawn weapons, entered the card room, giving the command: "Stick them up; we mean business." Vejar, Washburn and Crosby immediately obeyed the command. McAllister walked over to Crosby and, uttering an abusive term, struck him upon the face. He walked over to Vejar, whom he evidently knew to be an officer, and struck him on the chin, and said: "You bastard, I know you, how do you like being on the other end of it?" Everyone was then made to stand with his back to the wall, searched, and all the

money taken from their persons by McAllister was thrown on the poker table, defendant Rogan holding the company at bay with a drawn pistol in each hand, while the search was conducted by his companion. Having taken some $65 from his victims, McAllister asked Crosby where the rest of the money was and, upon being told that his partner (Minstrot) had taken the money and that the only money he had left was a dollar which he carried in his shoe for luck, Crosby was ordered to lie down on the floor and take off his shoes and socks, which he did. Thereupon McAllister placed Crosby's leg under his arm and proceeded to apply lighted matches to the bottoms of his feet, at the same time saying, "Come through with the money." Crosby cried out in great pain and protested that he had no other money in his custody or under his control. McAllister then struck him on the jaw with his gun. He then commanded the other occupants to lie down and take off their shoes. After he had burned the feet of Crosby, he approached Vejar and said, "You are next." Vejar then drew a gun from his shoulder holster and simultaneously several shots were fired by McAllister, Rogan and Vejar. When the shooting ceased, McAllister lay dead, with six bullet wounds in his body, and Vejar, who had received a mortal wound, from a bullet which entered near the corner of his mouth and plowed its way through the neck and finally lodged in his right shoulder, lay near him. Vejar was upon his back and requested that someone turn him over, so that the blood would flow from his mouth. Washburn asked permission of Rogan to comply with this request, but Rogan, with drawn revolver, refused the request. Mrs. Daughney attempted to place a pillow under his head, but was halted by defendant Rogan and ordered by him to sit down. Vejar died soon thereafter. Rogan received a minor bullet wound in one of his legs. During the time the occupants of the clubroom were being searched by McAllister, Rogan held a pistol in a threatening manner in each hand, commanding obedience to the orders given by McAllister or himself. The .45 automatic in the possession of Rogan was given over to McAllister before the firing commenced. McAllister, shortly before the shooting, had taunted Vejar, as he lay upon the floor, with questions as to how a deputy sheriff liked being "on the other end of it". He had struck him with his fists

before ordering him to the floor. A number of tantalizing terms were applied by McAllister both to Vejar and Crosby. Vejar, while on the floor shortly before death, said: "You got me, you bastards, but I got you both."

After the shooting, defendant Rogan gathered up the loot that he had taken from the persons whom he had assisted in robbing, took his companion's automatic .45 pistol, and entered a taxicab, which he had ordered Washburn to call, admonishing him at the time to be "God damned careful to call a taxicab and not the police department". Rogan, according to his own story, made his way to San Francisco and remained at his mother's home in that city for two days, and then went to the mines located in the Siskiyou Mountains, northern California. Some six months thereafter he boarded a tuna fishing boat bound for Lower California. He next shipped on a boat plying off the coast of Mazatlan, Mexico, which was engaged in the rum running trade. When in San Francisco on a visit to his mother's home, approximately one year after the homicide, he was apprehended and placed under arrest. ■ The bullet which killed Vejar was undoubtedly fired from the revolver held in the hands of Rogan. The ballistic expert testified that it was of .38 caliber, which fitted the revolver that he used, while the weapon used by McAllister was a .45 automatic pistol. Besides, there is direct evidence that Rogan fired the shot which took Vejar's life. But, if it be a fact that McAllister fired the fatal shot, that circumstance would not relieve the appellant of his responsibility for the homicide if he, together with his associate, was engaged in the perpetration of robbery. The evidence is amply sufficient to sustain the jury's verdict upon the theory that the defendant and McAllister were confederates in the commission of a robbery at the time the homicide was committed and, under that state of facts, it would matter not which one fired the fatal shot, as each would be equally guilty under the provisions of section 189, Penal Code.

■ Appellant has very earnestly attacked the conduct of the district attorney and the trial judge, which he claims prejudiced his right to a fair and impartial trial. Many of the assignments are very similar in substance to complaints which are frequently presented to this court for review in death penalty cases. By affidavit, appellant sets

out the greater part of the district attorney's opening argument to the jury and vitalizes, as well as written words are capable of doing so, the vehement manner and the vociferousness of voice in which it was delivered. While we cannot approve all the alleged acts of misconduct complained against by appellant, and feel that the prosecuting officer went beyond the limits of legitimate argument in two or three instances, we cannot say that his utterances in that respect acted so powerfully upon the minds of the jury as to have held its reason and its inherent sense of justice captive during the balance of the proceeding, to the extent that the admonition of the court to disregard all improper allusions of counsel, as set forth in the final charge, fell upon minds rendered incapable of giving full effect and consideration to the evidence and legal regard to the rights of the defendant, by reason of said improper utterances. While many of the specifications of misconduct were, strictly speaking, properly taken, such matters were, nevertheless, matters of common knowledge or notoriety and were, beyond doubt, within the minds of all persons of average intelligence. The recent hangings in this state of two young men, without trial, to which reference was made by the prosecuting officer, furnish an apt example of the references made by counsel from which the inference was drawn that the laxity of juries in returning verdicts which prevent the law from imposing penalties in criminal cases adequate to the enormity of the offenses committed, was responsible for the upheaval of public indignation as illustrated by said lynchings. The prosecuting officer, being no doubt convinced that the instant case properly called for the imposition of the death penalty, in his effort to awaken in the minds of the jurors the importance of maintaining a proper respect and regard for law enforcement, earnestly called upon members of the jury who should be likewise convinced, not to surrender their convictions by way of compromise and agree to a verdict carrying a lesser penalty, merely for the sake of reaching an agreement. The prosecuting officer, in his zeal to secure a verdict imposing the extreme penalty of the law, stated in argument that the average man spends but a few years in the penitentiary under a sentence for life and that the system of parole offers an easy way for guilty persons to escape adequate

and just punishment. Such expressions should be avoided, but in view of the record of this case, such error cannot be held to be reversible error. (*People* v. *Reilly*, 208 Cal. 385 [281 Pac. 606]; *People* v. *La Verne*, 212 Cal. 29 [297 Pac. 561]; *People* v. *Rameriz*, *ante*, p. 559 [36 Pac. (2d) 628], decided by this court October 1, 1934.) ██ Said officer also improperly made reference in the argument to his personal knowledge of the good qualities of the deceased, notwithstanding the fact that there was no evidence in the record bearing upon his character, and which appellant assigns as reversible error.

██ It is true that the assistant district attorney was rather vehement and at times indulged in verbal thrusts and, upon one or two occasions, characterized the defendant as a "racketeer" and an associate of the underworld gentry. The habits and character of the defendant, as revealed by his own admissions, showed that he had led a checkered life, which was by no means free from lawless tendencies. We cannot say that the prosecution's characterization of the defendant was entirely unwarranted.

Other instances of misconduct are assigned as prejudicial error, but we have examined all of the assignments and are of the opinion that none separately or all considered together would justify a reversal. Upon occasions the court did, at the moment objection was made to conduct which the court deemed improper, admonish counsel and instruct the jury to disregard the same. Upon two or more occasions, it remained silent. But, upon the final charge, the jury was instructed in proper form and language to disregard all expressions or remarks which tended to prejudice the defendant, and which had no support in the evidence.

██ We have also examined the assignment of the court's alleged misconduct, which arose in a discussion between the court and counsel for the defendant, and we cannot believe that the subject matter was of sufficient gravity to have impressed the jury. ██ We feel that there is no merit in the assignment that the court refused to permit what counsel terms an impeachment question asked witness Mrs. Daughney. It appears that after the witness (Mrs. Daughney) had been cross-examined for some time, a recess was taken, during which E. R. Vejar, a brother of the deceased officer, and a third person, whose identity was not disclosed, had a short conversation with witness Daughney. It was

claimed that this conversation was overheard by Ruth Rogan, a sister of the defendant. Appellant offered to show that said conversation was in substance that witness Daughney, who had been addressed during recess by Vejar, replied to whatever remark Vejar made to her as follows: ''I am scared but I am not afraid.'' Whereupon Vejar advised her not to say that he had told her to say anything and it did not matter what she said so long as she would say that Rogan killed Vejar. This question was objected to on the ground that the proper foundation was not laid by failure to name or identify the third person in whose hearing and presence the above remark was alleged to have been made. The witness Daughney had made answer to a previous question that she had not discussed her testimony with Vejar. The third party was not produced or identified and neither Ruth Rogan nor anyone else was called to prove the alleged conversation. At most, nothing appears which tends to show more than that an improper remark was made in the presence of the witness by Vejar. No claim is made that the witness assented to or was influenced by the alleged suggestion made by Vejar. It may have been a proper matter to have brought to the court's attention in a contempt proceeding. The mere remark of Vejar could not be regarded as an impeachment of the witness, who made no assent to the suggestion of Vejar. Besides, the witness had already testified fully as to the shooting of Vejar by Rogan.

■ Appellant contends that he was intoxicated to the degree that he was incapable of forming a criminal intent and that he, therefore, is not guilty of first degree murder. It is true that there was evidence that he did partake of intoxicating liquor prior to the homicide, but, on the other hand, there is evidence that he held himself sufficiently in hand to have successfully carried out a robbery, made away with the loot, and escaped from the scene. He certainly gave evidence of co-ordination in the execution of the crime.

■ Appellant makes the further defense that McAllister, who had lost a sum of money at the gaming table, had been cheated by the employment of trick and device by the dealer of the game and, therefore, it was not robbery for him to retake, by force of arms, the money he had thus lost. Appellant, of course, claims to have been acting with Mc-

Allister in the recapture of his lost stakes. That McAllister and defendant Rogan armed themselves preparatory to making a return visit to the club, with the intent to take by force moneys found in the possession of any and all the occupants of said clubrooms is fully supported by their subsequent acts. They did not confine or limit their demands for money to the proprietor of the club, but robbed all persons present in said establishment, several of whom had no connection with Minstrot, the dealer, who had previously left the premises with the proceeds of the gambling table. The question as to whether or not McAllister and Rogan had the intent to limit their lawless act to the retaking of the amount lost by McAllister in the manner above referred to was indisputably a question of fact for the jury's determination, and there is an abundance of evidence to support their finding. The robbery was, in fact, general and without discrimination as to persons present. Vejar was undoubtedly killed in its perpetration by a pistol shot fired by defendant Rogan. This is shown by the testimony of several eye-witnesses. The only evidence that in any way tends to mitigate the killing is given by the defendant, which is highly, if not inherently, improbable. This being the state of the record, we are unable to grant the appellant any relief from the judgments appealed from.

The judgments and orders appealed from are, therefore, affirmed.

Waste, C. J., Langdon, J., Preston, J., Curtis, J., and Shenk, J., concurred.

Rehearing denied.