52 Cal.2d 871 (1959)
THE PEOPLE, Respondent,
v.
THOMAS PURVIS, Appellant.
Crim. No. 6434. 
Supreme Court of California. In Bank. 
Nov. 6, 1959.
 Martin N. Pulich and George Nye, Public Defenders (Alameda), and H. Reed Searle, Assistant Public Defender, for Appellant.
 Stanley Mosk, Attorney General, John S. McInerny, Edward P. O'Brien and Arlo E. Smith, Deputy Attorneys General, J. Frank Coakley, District Attorney (Alameda), and Francis W. Vukota, Deputy District Attorney, for Respondent.
 TRAYNOR, J.
 Defendant was charged with the murder of Mrs. Hazel Wilson. He entered pleas of not guilty and not guilty by reason of insanity. A jury found him guilty of murder of the first degree, fixed the penalty at death, and found that he was sane at the time of the commission of the crime. The trial court denied defendant's motion for a new trial and sentenced him to death. This appeal is automatic. (Pen. Code, 1239, subd. (b).)
 In 1950 defendant was convicted of the second degree murder of his wife and sentenced to prison. He was paroled in 1954 and returned to Oakland. On December 19, 1957, he killed Mrs. Wilson. He met her in June 1957, and the next day she moved into his apartment and stayed for several *876 days. Until the end of July she divided her time between her home, where she lived with her husband and three children, and defendant's apartment. During her first visit she told defendant that she was married and had three children and was living with her family, that she had temporarily left her family on other occasions, and that she was divorcing her husband. Defendant told her that he was on parole for the murder of his wife. They agreed to marry when Mrs. Wilson's divorce became final. No divorce action had been filed.
 Mr. Wilson discovered where defendant lived and that his wife was being unfaithful. He first met defendant on the street early in July and told him to stay away from his wife. He asked what defendant would do if he came to defendant's apartment, and defendant replied, "I guess I'd kill you; I have a gun in my house." Another time, defendant went to the Wilson apartment when Mr. Wilson was the only one present. He told Mr. Wilson that he had come to get a clock, and Mr. Wilson told him to take what was his and get out. In the course of their conversation, defendant stated that he had killed once and could kill again.
 In the latter part of July, defendant and Mrs. Wilson decided to separate temporarily, and defendant told her to return to her home until the situation improved. On July 31st he went to her home to return clothes she had left at his apartment. He testified that she accused him of asking her to leave his apartment so that another woman could move in and told him she was going to call the police and tell them that he had been threatening her. According to the testimony of the children who were present, defendant became extremely angry and made jabbing motions at Mrs. Wilson with a knife. Mrs. Wilson said to her son, "He is trying to kill me, call the police." Mrs. Wilson and the children left her apartment, and defendant returned to his home. Shortly thereafter the police arrived and arrested him. They asked him where the knife was, and he pointed to a paring knife in his kitchen. He pleaded guilty to disturbing the peace (Pen. Code, 415) and was sentenced to 90 days in the county jail. His parole was not revoked.
 Defendant was released from jail on November 13th. He had lost his apartment and moved into an apartment with his son and daughter-in-law. He resumed seeing Mrs. Wilson and spent the night with her at a hotel near her home on several occasions, the last about a week before the homicide. During this period defendant was unemployed, and he passed worthless *877 fictitious checks, which by December 18th totalled $281. He testified that all of the checks were cashed at Mrs. Wilson's request, but there is evidence that on at least one occasion he was with another woman when he cashed a fictitious check.
 The tenant who rented defendant's apartment after he had been sentenced to the county jail testified that two or three weeks after his release from jail, he came to the apartment and gave her a set of keys. He asked if she found the gun he had hidden above the transom and told her that he would kill Mrs. Wilson because she had him sent to jail. The tenant found no gun in the apartment. Defendant denied the conversation about the gun and Mrs. Wilson.
 About the end of November defendant purchased a 22-caliber pistol and some shells from a person he met in a bar. He testified that he paid $15 for the gun with the understanding that the seller would buy it back later for $20. He also testified that he tried several times to sell the gun, but statements he made to the police tend to contradict this testimony.
 Mrs. Wilson's son Charles testified that about a week or 10 days before the homicide, defendant came to their home in the evening while he and his mother were watching television. Mr. Wilson was asleep in another room. Defendant told Mrs. Wilson that he loved her and that "if you ever leave me, I will kill you." Charles became annoyed at defendant's behavior and compelled him to leave.
 On December 17th defendant wrote Mrs. Wilson a letter, which was postmarked 1:30 a.m., December 18th. It stated: "Haze Darling: I am writing this to let you know that I love you, sweetheart, and always will. Until I die your lovely face will always be before me. Thanks honey for the wonderful hours you have given to me. Your love has been the sweetest and best that any man could ever receive from a woman. Honey, as you have probably heard by now, I am in trouble. I will not be able to see you or write to you again. My darling, forget you ever met me. I am no good for you. Remember this my darling, I love you forever. Mom dear, please, please don't be too angry with me. What I have done is wrong but I done these things so I could be with you. Haze darling, I love you with all my heart and soul. Goodbye, my darling. I love you, my angel. Tom Purvis."
 In the daytime on December 18th, however, defendant visited Mrs. Wilson at her home with his son. The visit was amicable, and Mrs. Wilson apparently expected defendant to return the next day. She told her son Charles the next morning *878 to come home for lunch because defendant and his son were coming over with a crash helmet for Charles to use while motorcycling.
 Defendant left his son's apartment about 9 a.m. on December 19th and took the 22-caliber pistol with him. He went to Mrs. Wilson's apartment and was admitted by her 10-year-old daughter. Mrs. Wilson had gone back to bed after preparing breakfast for Charles and her husband, who had left before defendant arrived. The daughter took defendant into the bedroom, and he told her to leave. She went into the hall and played with some other children and then went upstairs to the apartment above. Before she left the hall she heard defendant speak of a letter and heard Mrs. Wilson tell defendant to "sign it" and heard defendant say, "no, you sign it."
 Defendant testified that he went into the bedroom and talked with Mrs. Wilson about a crash helmet that he was going to buy for Charles. Mrs. Wilson said she was not feeling well, and they went into the kitchen so that she could take some medicine. They returned to the bedroom and again discussed the crash helmet and a radio defendant intended to buy Mrs. Wilson for Christmas. He told her he could buy the crash helmet and radio if he received an unemployment check and could sell the pistol, which he took out of his belt and laid on a dresser. Mrs. Wilson then asked defendant to sign another fictitious check, and he said that if any more checks were to be signed she would have to sign them. She asked him if he were "going to do as she told me to," and he said "no." Sometime during the conversation he left the room while she dressed. They argued further about who was to sign the check, and she asked him to go to a liquor store and get some whiskey, but he refused. She then told him that she was going to call the police and tell them that he had been threatening her again. She did not threaten him physically, but she said that she would send him back to San Quentin "for good."
 The next thing defendant remembers was walking down the street with the pistol in his belt. He went into a bar, ordered a glass of beer, and told the bartender to call the police. He put the pistol on the counter, and when the bartender told him that he would get in trouble if the police saw him carrying a weapon, he said "Well, it doesn't matter." Then he said, "There is a dead woman up there." Under questioning by the police and on cross- examination at the trial, defendant was unable to remember what happened after Mrs. Wilson told him she would have him returned to San Quentin. *879 He had suffered such a lack of memory only once before, in 1950 when he killed his wife.
 When the police officers arrived at the bar, they searched defendant and removed the gun. He directed them to Mrs. Wilson's apartment, where the officers found her body on the floor. She died as a result of multiple gunshot wounds from bullets fired from defendant's gun. He told the arresting officers, "I loved her, I shot her, and she will never drag another man down." Later on the way to the police station, he said, "I pumped seven bullets in her and that ought to do the job."
 Defendant contends that the evidence is insufficient to support a finding that the killing was "willful, deliberate, and premeditated" (Pen. Code, 189), and that since it could not be murder of the first degree under any other theory, the court should reduce the degree of the crime to murder of the second degree. (See Pen. Code, 1181, subd. 6.) Defendant concedes that standing alone the threats to kill and the purchase of the gun followed by its intentional use to kill would support an inference of deliberation and premeditation. He contends, however, that such an inference is wholly dispelled by other evidence in the record. (See People v. Holt, 25 Cal.2d 59, 69-70 [153 P.2d 21].) He points out that he vacillated in his attitude toward Mrs. Wilson and contends that at the time of the killing the evidence establishes that any preexisting hostility toward her had been dissipated. Accordingly, he concludes that the only reasonable inference is that the killing was the unpremeditated result of the sudden quarrel that immediately preceded it and Mrs. Wilson's threat to send him back to prison for good.
 [1] The jury was not compelled to draw that inference. Defendant had threatened to kill Mrs. Wilson for sending him to jail, and he knew before the killing that his writing of fictitious checks could result in the revocation of his parole. His statement following the killing that "she will never drag another man down" indicates that he held her responsible for his difficulties. Whatever his feelings toward her may have been at the time he wrote the farewell letter of December 17th, the jury could reasonably infer that by the 19th, defendant had decided that Mrs. Wilson was responsible for the check writing that could return him to prison, and that the revenge, threatened before, should now be carried out.
 [2] Even if the jury rejected revenge as a motive for the killing, it could reasonably conclude that the killing was deliberate and premeditated on the ground that defendant *880 could not tolerate Mrs. Wilson's living apart from him, that for him the relationship must be terminated by her death or not at all. He had told her that "if you ever leave me, I will kill you," and the jury could conclude that the thought of her living apart from him was intolerable whether the cause was her leaving or his return to prison. He did not carry out his expressed intent never to see her again, but returned to her home twice, the second time armed with the gun with which he killed her.
 The jury was not compelled to believe defendant's testimony that he took the gun with him on the day of the killing solely to sell it, that a serious argument developed over who should sign a check, and that Mrs. Wilson threatened to send him back to prison. Moreover, even if Mrs. Wilson made such a threat, the jury could reasonably discount it as a cause for a sudden attack, for defendant believed that his parole would soon be revoked. Whatever the motive for the killing may have been, the evidence fully supports the jury's conclusion that it was "willful, deliberate, and premeditated," and was therefore murder of the first degree.
 [3] There is no merit in defendant's contention that the verdict of guilty of murder of the first degree was induced by misconduct of the prosecuting attorney. In arguing the significance of defendant's claimed lack of memory of the shooting, the prosecuting attorney pointed out that defendant's only other failure of memory occurred when he killed his wife, and argued that there was no reason to believe he would fail to remember only these two events, that "He knows," and that, "as an old pro that he is, he now figures out his conduct after it happens." This argument did not suggest to the jury, as defendant contends, that he should be found guilty of murder of the first degree because he had killed his wife or was not truthful in his testimony. It was directed to defendant's credibility as a witness, it was based on evidence in the record, and it was within the scope of proper argument as to how the jury should view defendant's testimony.
 Penal Code, section 190.1, provides for further proceedings to determine the penalty after a defendant has been found guilty of an offense punishable by life imprisonment or death. "Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. ..."
 Defendant contends that the trial court erred in the penalty *881 phase of the trial in permitting the prosecution to prove the murder of his wife by the testimony of witnesses instead of by the record of his trial for that murder and that the error was compounded by the prosecuting attorney's argument that defendant had fooled the jury that found him guilty of the second degree murder of his wife. He contends that despite the trial court's admonition that it felt the jury should accept the verdict of second degree murder as determinative in the case of defendant's murder of his wife, the prosecution was in effect allowed to relitigate that case.
 [4] When the issue to be determined is the penalty to be imposed for a subsequently committed crime, however, the rules of res judicata may not properly be invoked to foreclose inquiry into relevant circumstances surrounding an earlier crime of which the defendant was convicted, for the fact that a defendant's criminal responsibility for an earlier crime has been fixed by a conviction does not justify denying to the jury charged with fixing the penalty for another crime relevant evidence bearing on that issue. (See People v. Friend, 47 Cal.2d 749, 763, footnote [306 P.2d 463].)
 [5] In the present case there was a marked similarity between the circumstances surrounding the two murders. In both, defendant killed the woman with whom he had been emotionally involved at a time when separation was imminent, in the former case because his wife had ordered him to leave so that she might pursue an affair with another man, and in the latter because defendant expected to return to prison. In both he armed himself with a gun on the day of the killing, and in both his explanation for so doing did not compel belief. In both the killing was preceded by an altercation with the woman involved that resulted in defendant's criminal prosecution, and in both defendant testified that he could not remember the killing. The jury was entitled to consider this recurrent behavior on the issue of punishment, for it might conclude that the behavior would probably or possibly recur again were defendant given a life sentence and ultimately paroled.
 Much of the evidence of the former murder was favorable to defendant. It indicated serious provocation on the part of his wife, her contempt for him and her unfaithfulness to him. Such evidence might lead the jury to conclude that the fact defendant had killed his wife did not support imposing the death penalty for the killing of Mrs. Wilson.
 The jury could not have intelligently assessed the significance of defendant's killing his wife had the relevant circumstances *882 surrounding the crime been excluded by restricting proof to the fact that he had been convicted of her second degree murder. [6] Moreover, in fixing the penalty for the murder of Mrs. Wilson, the jury was not bound by the former jury's finding that defendant's murder of his wife was of the second degree. Although that finding terminated defendant's liability to further prosecution for that crime, it was based on the evidence then before the jury that may have reflected only a reasonable doubt that a premeditated killing had occurred. Another killing as similar as the one that occurred here might dispel that doubt, and the jury fixing the penalty for the latter killing should be permitted to determine that issue on all the evidence before it without being bound by what another jury concluded on different evidence. In so doing, the second jury would not be redetermining defendant's criminal responsibility for the killing of his wife, but fixing the penalty for his killing of Mrs. Wilson.
 [7] To prohibit a jury from looking behind a former verdict might seriously prejudice defendants in other cases. A defendant convicted of murder of the first degree might have compelling evidence to prove his innocence of a prior crime of which he had been convicted. It might even appear that the motive for the killing was the victim's false testimony that led to the prior conviction. Surely such evidence would be admissible on the issue of punishment even though it required the impeachment of a former verdict to introduce it.
 [8] When a jury determines punishment in a case where the death penalty is permissible, it performs a function similar to that performed by the Adult Authority in fixing terms and granting paroles in other cases. To perform its function intelligently, the jury, like the Adult Authority, must be free to fix the penalty for the crime of which defendant stands convicted within the legal limits prescribed on the basis of its own evaluation of all of the evidence before it.
 [9] Defendant contends, however, that the best evidence of the circumstances of the former killing was the transcript of the testimony at the former trial and that it was therefore error to permit the witnesses at the former trial to testify at the present trial. There is no merit in this contention, for the testimony of witnesses who are available is preferred to the record of their testimony given at another time. (Pen. Code, 686; Code Civ. Proc., 1870, subd. 8; Blache v. Blache, 37 Cal.2d 531, 535 [233 P.2d 547].)
 [10a] Defendant pleaded guilty to being intoxicated in *883 a public place in 1948 and to battery and disturbing the peace in 1950. These offenses were related to the difficulties he was having with his wife, and he was granted probation on both occasions. Defendant contends that at the trial on the issue of penalty the court erred in excluding the probation reports and the files of the Alameda County Probation Department including his progress reports while on probation. He also contends that the court erred in excluding his parole file prepared by the Department of Corrections. He points out that all of these documents contain relevant evidence of his "background and history" and of "facts in aggravation or mitigation of the penalty." (Pen. Code, 190.1.) Since Penal Code, section 1204, authorizes a court to consider probation reports in fixing penalties, he contends that the jury should be given the benefit of the same data when it must fix the penalty. Although section 1204 does not refer to parole files or files of the probation department, other than probation reports, defendant contends that since all of these documents are prepared by trained experts they should be admissible pursuant to the policy underlying section 1204. Defendant concedes, however, that the documents involved include hearsay statements of facts and opinions that would ordinarily be regarded as incompetent evidence, and it is clear that in many cases such evidence would be extremely prejudicial to the defendant. [11] We do not believe that by enacting section 190.1 and broadening the scope of relevant evidence admissible on the issue of penalty the Legislature meant that incompetent evidence should be presented to the jury. Section 190.1 does not so provide, and the provision of section 1204 permitting trial courts to consider probation reports was not amended to make it applicable to trials of the penalty issue before juries. The Legislature could reasonably conclude that a trained trial judge could properly evaluate, as a jury could not, the otherwise incompetent evidence contained in probation reports.
 [12] In People v. Green, 47 Cal.2d 209 [302 P.2d 307], decided in 1956 before section 190.1 was enacted, we ordered a new trial in a death penalty case limited to the issue of the penalty to be imposed. We stated: "There arises the question of the character of the evidence to be received on the limited new trial for the determination of punishment. Where the question (together with the degree of the crime) is determined by the court on defendant's plea of guilty to a charge of murder, the hearing 'is not a trial in the full technical sense, and is not governed by the same strict rules of procedure *884 as a trial,' and the court in aggravation or mitigation of the offense may consider matters not admissible on the issue of guilt (People v. Gilbert (1943), 22 Cal.2d 522, 528 [140 P.2d 9]; People v. Thomas (1951), supra, 37 Cal.2d 74, 76-77 [230 P.2d 351]), although the determination must be made upon 'competent evidence' (People v. Mendez (1945), 27 Cal.2d 20, 23 [161 P.2d 929]). Where the matter is to be determined by a jury, however, it would appear that the proceeding should be 'a trial in the full technical sense, and ... governed by the same ... rules of procedure' as the trial of the issue of guilt." (47 Cal.2d at 236.)
 Section 190.1 now sets forth the facts that may be proved in the separate proceedings on the issue of penalty, but it does not change the rule of the Green case as to how those facts are to be proved. [10b] Accordingly, the trial court did not err in excluding the offered documents.
 Defendant called Warden Clinton Duffy, Vice-Chairman of the Adult Authority, as an expert witness to present testimony with respect to whether defendant would ever be paroled. During his examination it was brought out that under present law, if defendant was given a life sentence, he could be paroled after serving seven years. Warden Duffy testified, however, that the average time served by persons given life sentences for first degree murder was 12 years; that the Adult Authority would "take a very dim view" of ever paroling a person who had been sent to prison for first degree murder with a prior conviction of second degree murder; and that although he did not have the statistics, of the two cases he remembered of persons who had committed a second murder, one died in prison and the other was still in prison after serving more than 25 years. Although Warden Duffy was familiar with defendant's record, including many of the details of the second murder, he was not permitted to state his opinion as to how long defendant would serve or as to whether he would ever be paroled if given a life sentence.
 [13] It is settled that to assist the jury in fixing the penalty, it may be informed of the minimum term a person given a life sentence for first degree murder must serve and the minimum, average, and maximum terms actually being served for first degree murder in California. (People v. Friend, 47 Cal.2d 749, 755 [306 P.2d 463]; People v. Green, 47 Cal.2d 209, 217 [302 P.2d 307]; People v. Barclay, 40 Cal.2d 146, 158 [252 P.2d 321].) Although the practice of the Adult Authority and the law governing paroles may *885 change between the time of trial and the time a defendant may first be considered for parole, these cases establish that the present law and practice sufficiently reflect what will probably happen in the future to justify informing the jury of present law and practice to assist it in assessing the significance of a life sentence. [14] Accordingly, since Warden Duffy was a qualified expert on the present practice of the Adult Authority, he should have been permitted to state his opinion as to how the Authority would treat defendant's case. In view of the fact that he was allowed to testify that the Adult Authority would "take a very dim view" of paroling a person convicted of first degree murder with a prior conviction of second degree murder, it may be doubtful whether, standing alone, the refusal to permit him to express an opinion directed expressly to defendant's case was prejudicial. There were other errors, however, bearing directly on the jury's assessment of the possibility of parole that compel a new trial on the issue of penalty.
 Over objection, the prosecution was permitted to introduce nine records dealing with fourteen persons, some but not all of whom had been released or paroled by the Adult Authority after suffering two or more convictions of felonies. None of these persons had committed murder. Their crimes included robbery, burglary, escape, forgery, issuing worthless checks, using the mails to defraud, impersonating a government employee, petty theft, and damaging a jail. In admitting this evidence the trial court stated to the jury that "you as jurors having found this man guilty of murder of the first degree, obviously not only want to know, but it is your duty to know, what is going to happen to him in the future. So for that purpose I am admitting it." Thus, the trial court in effect directed the jury that the Adult Authority's release or parole of a few recidivists who were not murderers was relevant in determining its practice with respect to recidivist murderers. This direction is obviously a non sequitur. Murder is a far more serious offense than any of those reflected in the records introduced in evidence, and there is no basis in the evidence for assuming that the Adult Authority's action in these few cases reflects its policy in dealing with first degree murderers, let alone such murderers who have murdered before.
 The attorney general contends, however, that the records were admissible to impeach Warden Duffy's testimony on cross-examination that the primary concern of the Adult Authority was protection of the public and that he did not *886 believe persons convicted of four or five robberies had been paroled. The evidence was not admitted solely to impeach Warden Duffy's testimony, however, but to show "what is going to happen to [defendant] in the future." Moreover, none of the records dealt with persons who had been convicted of four or five robberies, and they did not by themselves tend to prove that the Adult Authority is not properly concerned with the protection of the public. The Adult Authority considers the cases of thousands of prisoners annually and Warden Duffy conceded that it makes mistakes. Whether those mistakes reflect indifference to protection of the public or are so few as to reflect an admirable administrative record of achievement requires more than the consideration of a few isolated cases.
 The determination of the relevancy of such evidence to the Adult Authority's effectiveness in protecting the public and to its probable treatment of defendant would require an overall assessment of the operation of the Adult Authority. It would require knowledge of the bases of its action in these other cases and the policies such action reflected. Without such knowledge the jury had no way to determine whether such bases and policies reflected indifference to the public or might apply to defendant's case and indicate a possibility or probability of his ultimate parole.
 We do not believe, however, that it would have been proper to admit the challenged records even if the prosecution had submitted sufficient additional evidence of the operation of the Adult Authority to establish the relevance of the records. To hold otherwise would turn every penalty trial of a person convicted of first degree murder into a trial of the Adult Authority and its wisdom in paroling any number of other prisoners. These considerations compel limiting evidence of the Adult Authority's practice in other cases to evidence of its practice in dealing with other first degree murderers.
 In the present case the error in admitting the challenged records was aggravated by the prosecuting attorney's use of them in his argument to the jury to disparage the operation of the Adult Authority (People v. Caetano, 29 Cal.2d 616, 619-620 [177 P.2d 1]; People v. Rogan, 1 Cal.2d 615, 621-622 [36 P.2d 631, 95 A.L.R. 560]), and his argument, unsupported by any evidence in the record, that the Adult Authority did not give proper consideration to recommendations of prosecuting attorneys with respect to punishment. (People v. Kirkes, 39 Cal.2d 719, 724 [249 P.2d 1]; People v. Evans, *887 39 Cal.2d 242, 251 [246 P.2d 636].) That the jury considered the possibility of parole important in fixing the penalty is demonstrated by its request during its deliberations that the challenged records be sent to the jury room. Moreover, in admitting the records, the trial court stressed the importance of what would happen to defendant if given a life sentence and clearly implied that the records had a significance in this respect that they did not have. [15] Under these circumstances there exists "such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result," and accordingly the error is prejudicial. (People v. Watson, 46 Cal.2d 818, 837 [299 P.2d 243]; People v. Dewberry, 51 Cal.2d 548, 558 [334 P.2d 852].) The error did not, however, have any bearing on the jury's determination that defendant was guilty of murder of the first degree and its determination that he was sane at the time of the commission of the crime.
 The judgment and order denying a new trial are affirmed insofar as they relate to the adjudication that defendant is guilty of murder of the first degree and was sane at the time of the commission of the offense, but insofar as they relate to the penalty, the judgment and order denying a new trial are reversed and the cause is remanded for retrial and redetermination of the question of penalty only, and for the pronouncement of a new sentence and judgment in accord with such determination and the applicable law. (See People v. Green, 47 Cal.2d 209, 236 [302 P.2d 307].)
 Gibson, C.J., Schauer, J., Spence, J., Peters, J., and White, J., concurred.
 McCOMB J.
 I would affirm the judgment in its entirety.