[Crim. No. 7309. In Bank. July 18, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. EDDIE DEAN GRIFFIN, Defendant and Appellant.

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.

Ellery E. Cuff and Erling J. Hovden, Public Defenders, Charles A. Maple and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal, pursuant to section 1239, subdivision (b), of the Penal Code, after a jury found defendant guilty of first degree murder and fixed the penalty at death.

Defendant contends:

First. *That the evidence was insufficient to sustain his conviction.*

This contention is devoid of merit. December 2, 1961, defendant encountered Eddie Seay and a friend of Eddie's named Al on a street corner in Los Angeles and asked directions to the 41st Street Club, a nearby bar. After receiving the directions, defendant gave Eddie a quarter, which was applied toward the purchase of a bottle of wine.

About 9 o'clock Eddie and Al entered the 41st Street Club and sat in a booth with Essie Mae Hodson and two other people. Eddie had been living with Essie Mae since 1957 and referred to her as his common-law wife.

Defendant, who was standing at the counter, was invited to the booth to join Eddie and the group. They drank wine and beer through the evening until Al left. Essie Mae left about 1 o'clock, and Eddie and defendant remained in the bar

until 2 o'clock. Eddie was fairly intoxicated and thought defendant was, also.

At defendant's request for a place to stay that night, Eddie took him to the apartment he shared with Essie Mae and told him he could sleep on a day bed in the living room. Eddie then retired to the bedroom with Essie Mae and went to sleep.

Later the noise of a struggle awakened Eddie, and he went into the living room, where Essie Mae told him, in defendant's presence, that she had gotten up to go to the bathroom and that defendant had put his hand over her mouth and tried to make her accept him.

Eddie advised defendant to go and drink some coffee, and took him down the back stairs. On the way downstairs defendant asked if he could come back upstairs and if Eddie would talk to Essie Mae for him. Eddie refused, took defendant outside, and went back upstairs the front way, locking the door.

Five minutes later Eddie heard defendant knocking and calling and the sound of glass breaking as defendant let himself in the back door.

Eddie got up, put on a pair of trousers, went to the back stairs, and again took defendant downstairs. Meanwhile, Essie Mae went out onto a balcony.

At the bottom of the stairs defendant hit Eddie two or three times, causing some injuries. Eddie was able to break away and ran over to the 41st Street Club, where someone he knew agreed to go with him back to the apartment building. They were unable to find Essie Mae, and Eddie never saw her alive again.

About 7 o'clock the next morning Alfredo Villasenor walked down an alley behind the apartment building, looking for a piece of scrap lumber. In the alley was a very large trash box containing several feet of sawdust and some scrap wood. Villasenor saw defendant come out of the box buttoning his trousers and asked him what he was doing. Defendant replied, "Nothing," and walked away.

Villasenor searched around for a piece of wood and finally looked into the box. There he saw Essie Mae. She had blood on her clothes, was trembling, and had apparently suffered a severe beating. Villasenor called to someone working in an adjacent trailer lot, who, in turn, called the police.

The officers found Essie Mae sitting on top of the sawdust in the box. She appeared to be under great shock, was bleed-

ing from the head, and could barely state her name. There was mud on her face, her clothes were wet, and there was blood in the sawdust.

Essie Mae was taken to Central Receiving Hospital, barely conscious and unable to answer questions. She was treated for her injuries, namely, bleeding from the left middle ear; a skull fracture; bleeding bruises on the left side of her scalp, both eyes, forehead, and lips; a 3-inch cut in her scalp; multiple abrasions of her ankles, hip and back; and a lack of blood pressure.

Essie Mae died the next afternoon. An autopsy was performed the following day, and the cause of her death was determined to be "subdural hematoma, which was operated with skull fracture."

An examination of her genital organs failed to disclose the presence of spermatozoa. The coroner testified, however, that this would not preclude the possibility of her having had intercourse late on the night of December 2 or early morning, December 3. He also testified that a woman with the extensive injuries suffered by her would be in great pain and it would be very difficult for such a person to engage in voluntary sex relations.

In addition, the prosecution produced expert testimony to the effect that the venereal disease commonly known as gonorrhea would destroy the ability of a male to produce spermatozoa. Defendant admitted to police officers that he had had both gonorrhea and syphilis.

There were blood stains at the foot of the back stairs, drag marks in the alley, and blood stains and a woman's wig in the sawdust box. Essie Mae had worn such a wig.

Defendant was arrested in Mexicali, and when questioned by officers freely and voluntarily told them that on the evening of December 2 he was at the 41st Street Club, where he met Essie Mae, Eddie, and some other people and had a number of drinks with them; that during the evening he gave Eddie a $10 bill with which to buy some wine; that Eddie disappeared with the change after an argument; that Essie Mae also left; that he inquired where they lived and went there; that Essie Mae let him in and, after some discussion, told him not to worry, that she would make good the missing change by letting him have intercourse with her; that they had just begun when Eddie came in the room and started a fight, in which Essie Mae joined and which continued down the back stairs and into the alley; that Eddie ran off; and

that Essie Mae, even though she had been hit several times in the fight, took him to the trash box, where she voluntarily engaged in the intercourse. Defendant said he left the box when he heard Villasenor, who he thought was a watchman, pass by.

The foregoing evidence substantially sustained the findings of fact of the jury.

In a criminal prosecution the weight of the evidence is for the jury to determine in the first instance, and the trial court after the verdict in the second instance. If, as in the present case, the circumstances reasonably justify the verdict of the jury, an opinion of this court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (*People* v. *Wein,* 50 Cal.2d 383, 398 [13] [326 P.2d 457]; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

*People* v. *Craig,* 49 Cal.2d 313 [316 P.2d 947], and *People* v. *Granados,* 49 Cal.2d 490 [319 P.2d 346], are clearly distinguishable from the present case. In neither case was there direct or circumstantial evidence that the defendants had raped, or attempted to rape, their victims; and in the *Craig* case the only circumstantial evidence relative to that issue tended to the conclusion that the defendant did not attempt to perpetrate a rape (49 Cal.2d at p. 318 [2a, 3]).

Under those two cases, evidence that the defendant has brutally beaten or murdered his victim is insufficient to establish an intent to commit rape.

In the present case, the evidence is sufficient to establish an attempted rape.

First, there was evidence of defendant's assault on Essie Mae while she was in the apartment and his failure to deny her accusation that he was trying to rape her.

Second, defendant was seen buttoning his trousers as he walked away from the trash box, where Essie Mae sat bruised and bleeding. (Cf. *People* v. *Cheary,* 48 Cal.2d 301, 317 [20] [309 P.2d 431].)

Third, defendant admitted that he began an act of intercourse with Essie Mae in her apartment, entered the sawdust box with her with the intent of having intercourse, and did, in fact, have intercourse with her there. In this connection, the testimony of the autopsy surgeon that a woman with the injuries suffered by Essie Mae would not be likely

to engage in a voluntary act of sexual intercourse is also important.

The facts which defendant asserts establish his innocence are equally consistent with his guilt.

 Second. *That the evidence of defendant's assault on Amada Encinas was inadmissible on the issue of penalty.*

This contention is likewise without merit. In the trial of the penalty issue the principal evidence produced by the prosecution related to a similar offense committed by defendant on December 19, 1961, in Mexicali, Mexico.

December 4, 1961, defendant left Los Angeles and traveled to Calexico, where he obtained a job at a cotton compress. There he met a man named Willie Kerr and told him his name was Willie Fairchild. Defendant told Kerr he did not have a place to stay, and Kerr let him have a room at the house which he shared with his common-law wife, Amada Encinas, across the border in Mexicali.

On December 19, 1961, while Amada was preparing lunch, defendant asked her for a towel. When she took it into his room, he grabbed her, hit and kicked her, tore her clothes off, and tried to rape her. He kicked her a number of times and so dislocated her arm that it had to be put in a cast for 15 days. He beat the woman severely, but despite the beating she refused to submit to him, and when Kerr arrived home, defendant jumped off the bed.

Kerr and defendant engaged in some kind of argument. Eventually the police were called, and Kerr and defendant were taken to jail. Defendant was brought to trial by a Mexican court on a charge of rape and released.

Defendant testified in his own behalf on the penalty issue of the trial. He gave an account of the incident involving Essie Mae Hodson roughly paralleling his story to the police officers, which story had been read at the trial on the issue of guilt, except that he denied having had intercourse with Essie Mae in the trash box.

His version of the incident involving Amada Encinas was that she had voluntarily agreed to have sexual intercourse with him for $2.00 and that her husband had come in and given her the beating.

Defendant contends that the trial court erred in admitting evidence, over his objection, of the assault on Amada Encinas, because a Mexican court had, in effect, found him not

guilty of that offense, and that its decision is res judicata on that issue.*

■ It is established in this state that the doctrines of res judicata and collateral estoppel do not apply at the trial on the issue of penalty. In *People* v. *Purvis,* 52 Cal.2d 871, 881 [4] et seq. [346 P.2d 22], we held that on the penalty phase of a trial the rules of res judicata may not be invoked to foreclose inquiry into relevant circumstances surrounding an earlier crime of which a defendant was convicted, since the fact that his criminal responsibility for an earlier crime has been fixed does not justify denying to the jury charged with fixing the penalty for another crime relevant evidence bearing on that issue.

■ In the *Purvis* case the defendant had previously been convicted of the second degree murder of his wife. Upon his trial for the murder of another woman under circumstances markedly similar to those surrounding the killing of his wife, evidence respecting the latter killing was introduced on the issue of penalty. At page 882 [6] we said: ''Moreover, in fixing the penalty for the murder of Mrs. Wilson, the jury was not bound by the former jury's finding that defendant's murder of his wife was of the second degree. Although that finding terminated defendant's liability to further prosecution for that ·crime, it was based on the evidence then before the jury that may have reflected only a reasonable doubt that a premeditated killing had occurred. Another killing as similar as the one that occurred here might dispel that doubt, and the jury fixing the penalty for the latter killing should be permitted to determine that issue on all the evidence before it without being bound by what another jury concluded on different evidence. In so doing, the second jury would not be redetermining defendant's criminal responsibility for the killing of his wife, but fixing the penalty for his killing of Mrs. Wilson.''

The same principle is applicable here. Implicit in the verdict of the jury was a finding that the killing was committed during an attempted rape; and in fixing the penalty for such killing, this jury was entitled to consider the circumstances surrounding the crime of which defendant was accused in

---

*Since the State of California and the Government of Mexico are not identical parties and were not in privity, and this proceeding is for a different offenßse, this case does not involve the doctrine of res judicata but, rather, collateral estoppel. (Cf. *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.,* 58 Cal.2d 601, 604 [1] [25 Cal.Rptr. 559, 375 P.2d 439]; 29 Cal.Jur.2d (1956) Judgments, § 215, p. 169.)

Mexico, there being a marked similarity between the circumstances surrounding the two attacks.

In each instance defendant had persuaded the man with whom the woman was living to allow him to stay temporarily in the home they were sharing; while defendant was in a room alone with the woman and the man was either away from the house or asleep in another room, he tried to induce the woman to have sexual relations with him and, when she refused, beat her severely. In each instance he contended that the woman had voluntarily agreed to have intercourse with him for a sum of money.

As stated in *People* v. *Purvis, supra,* at page 881 [5]: ". . . The jury was entitled to consider this recurrent behavior on the issue of punishment, for it might conclude that the behavior would probably or possibly recur again were defendant given a life sentence and ultimately paroled."

The fact that defendant may have received the equivalent of an acquittal in the Mexican proceedings is immaterial. An acquittal is merely an adjudication that the proof at the prior proceeding was not sufficient to overcome all reasonable doubt of the guilt of the accused. (*In re Anderson,* 107 Cal.App.2d 670, 672 [237 P.2d 720] [hearing denied by the Supreme Court]; cf. *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd., supra,* 58 Cal.2d 601, 605.) Accordingly, if evidence of another offense is otherwise admissible, the fact that the defendant was acquitted does not render the evidence inadmissible. (*People* v. *Massey,* 196 Cal.App.2d 230, 234 [4] [16 Cal.Rptr. 402]; *People* v. *Crisafi,* 187 Cal. App.2d 700, 707 [10 Cal.Rptr. 155] [hearing denied by the Supreme Court].)

Third. *That the prosecution was guilty of prejudicial misconduct in its argument to the jury on the issue of penalty.*

Defendant contends that it was error for the prosecutor to argue (1) that defendant had committed a crime in Mexicali; (2) that defendant, knowing he had a venereal disease, had sexual intercourse with women; (3) that defendant probably lied about his prior record to the Mexican authorities; and (4) that the jury would be responsible if defendant was paroled and then killed, raped, or infected anybody; he also contends (5) that the prosecutor improperly asked the jurors to hold out for the death penalty.

It is settled that the prosecutor may argue any matter helpful to his case as long as he confines himself to the record and those inferences which may reasonably be drawn there-

192

from. (*People* v. *Atchley,* 53 Cal.2d 160, 174 [14, 15] [346 P.2d 764]; *People* v. *Cheary, supra,* 48 Cal.2d 301, 317 [20, 21]; *People* v. *Burwell,* 44 Cal.2d 16, 39 [33] [279 P.2d 744].)

Applying the foregoing rule, it is apparent that defendant's claims of error are without merit.

■ First, it was not misconduct to characterize defendant's brutal attack on Amada Encinas as a crime.

■ Second, the prosecutor's reference to defendant as one who, knowing that he had a venereal disease, would have sexual intercourse is supported by the record. Defendant admitted that he had had both gonorrhea and syphilis, but this knowledge did not deter him from forcing his sexual attentions upon Essie Mae Hodson and Amada Encinas.

■ Third, the judgment of dismissal or acquittal from the Mexican court was introduced in evidence at the specific request of the defense, and the prosecutor could properly argue that the jury could take into account the fact that defendant may have made untrue statements to the Mexican authorities about his record at the time he was booked.

■ Fourth, it was not improper for the district attorney to argue that in the event the jurors returned a verdict of life imprisonment, it would be their responsibility if defendant was released and harmed anyone. He was merely replying to defendant's argument that the jurors would be responsible if they returned a death sentence and it was subsequently established that defendant was innocent. ■ It is not misconduct for a prosecutor to reply to defense arguments as long as his comments are based on the record, as were these. (*People* v. *Rosoto,* 58 Cal.2d 304, 364 [73] [23 Cal.Rptr. 779, 373 P.2d 867].)

■ Fifth, it was not misconduct for the prosecutor to argue that if any juror to the very end of the deliberations believed that this was a proper case for the death penalty, he should adhere to his view rather than compromise his judgment. This was a proper statement of the law relating to the duties of jurors in their deliberations. The right of a juror to disagree in good conscience with his fellow jurors is a matter of universal knowledge. (*People* v. *Wade,* 53 Cal.2d 322, 332 [10] [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Wong Loung,* 159 Cal. 520, 535 [114 P. 829]; *People* v. *Tate,* 124 Cal.App. 48, 50 [2] [12 P.2d 102].)

■ In addition, defendant may not now be heard to object to the district attorney's argument, since he made no

objection at the time it was made and did not ask the trial court to instruct the jury to disregard it. (*People* v. *Robillard*, 55 Cal.2d 88, 102 [21] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Turville*, 51 Cal.2d 620, 636 [20] [335 P.2d 678].)

It is apparent that there is no error in the record.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Tobriner, J., and Peek, J., concurred.

PETERS, J., Concurring and Dissenting.—I agree with the majority that the portion of the judgment finding defendant guilty of murder in the first degree is supported by substantial evidence and should be affirmed. But, in my opinion, the portion of the judgment imposing the death penalty should be reversed, because inadmissible evidence that was prejudicial was erroneously introduced on that phase of the trial.

Preliminarily it should be pointed out that the determination of whether the death penalty or life imprisonment shall be imposed rests solely in the discretion of the jury. The presence of aggravating circumstances is not necessary to impose the death penalty, nor need there be ameliorating circumstances to warrant the jury in imposing a life sentence. It follows that, if any major error on this phase of the trial in the introduction of evidence occurs that has any relationship to the character of defendant, such error must be held to have been prejudicial. Just such an error, in my opinion, here occurred.

On the guilt phase of the trial the prosecution produced evidence that the victim died after being brutally beaten and raped by defendant. Then, on the penalty phase of the trial, the prosecution, over objection, was permitted to introduce evidence that shortly after the offense here was committed, and while defendant was still at large, he brutally beat and tried to rape a woman in Mexico under circumstances remarkably similar to the beating and rape here involved. The prosecution was permitted to introduce full and complete evidence concerning the details of this claimed other offense. As pointed out by the majority this was the "principal evidence produced by the prosecution" on this phase of the trial. It permitted the prosecution to argue that if defendant committed this second offense he was the

type of brutal and dangerous man that should never again be at liberty and should suffer the death penalty. If defendant had actually committed this offense in Mexico, the evidence would clearly have been admissible under the ''common plan'' exception to the general rule excluding evidence of other crimes. That is what most of the cases cited by the majority hold. But if defendant had not committed this crime in Mexico, permitting the prosecutor to argue and this jury to find that he had, and to use this fact as the basis of imposing the death penalty, was gravely prejudicial. The obvious purpose of this evidence was to show the jury that defendant was habitually the kind of man that went around beating and raping women, and should never again be at large. It permitted this jury to, in effect, find that defendant, in fact, had committed this other crime, and therefore should die.

Defendant denied having committed the Mexican offense. This created no more than a conflict in the evidence. But the real question is whether defendant had committed this crime. It had been judicially determined in Mexico that there was not sufficient evidence to show that defendant had committed the offense. As the majority correctly point out, ''[d]efendant was brought to trial by a Mexican court on a charge of rape and released,'' that is, acquitted. But, in the prosecution in Los Angeles, the two principals in the Mexican case were permitted to testify to the very facts that had led the Mexican court and investigating officials to release the defendant. Defendant was compelled to rely on his version of the facts, unsupported by corroborating testimony. The credibility of the prosecution witnesses had already been judicially passed on adversely in Mexico. But now the defendant was called upon to once again face those very same witnesses. He was called to answer the argument of the prosecution that the Mexican court had ''made a mistake'' and ''I ask you ladies and gentlemen not to perpetuate the error.'' The prosecuting attorney several times told the jury that through his Mexican witnesses he had demonstrated that defendant had committed the offense in Mexico. The jury was told by the rulings on the evidence, and the arguments of the prosecutor, that it could not only believe these witnesses who testified as to the Mexican offense, but that it could, in effect, determine for itself whether the Mexican offense had been committed. They were told by the prosecutor that, if they came to the conclusion that the offense had been committed, they could consider that fact in

determining what penalty to impose. This was unfair and deprived defendant of a fair trial on the penalty issue.

The general rule is, of course, that evidence of other offenses is not admissible. To this rule there are several exceptions—but all of them relate to "other offenses." It is a far cry from the general rule to now hold, as do the majority, that, even though the defendant has been acquitted of the prior charge, evidence that he in fact committed the offense is now admissible. I realize that the rules of evidence and the proper scope of inquiry, on the penalty phase of the trial, are very broad. By section 190.1 of the Penal Code, on that phase of the trial, evidence "of the defendant's background and history," can be admitted. This court, quite properly, has interpreted this provision very liberally, both for defendant and the prosecution. Under the broad provisions of this section it is proper to inquire into all facets of the character of defendant and to show the jury just what kind of man he is. Under this liberal rule of admission it may be that the prosecution on the penalty phase of the trial could introduce the fact that defendant had been *charged* in Mexico with rape and that he had been acquitted. That is part of his background and history. But to detail the circumstances of the alleged crime through the mouths of witnesses that had not been believed in Mexico was to place the defendant in double jeopardy for the same offense in a very real sense. If there is to be a collateral estoppel against a defendant (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.,* 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439]) there should also be a collateral estoppel in his favor.

Aside from this reason why detailed evidence of other crimes alleged to have been committed in a foreign country where defendant has been acquitted in that country should not be admitted, there is another sound practical consideration that compels the exclusion of such testimony. Indigent defendants who have to be represented by the public defender, as did defendant here, are not in a position of financial equality with the prosecution, nor do they have the same means of persuasion as does the prosecution. This court and the United States Supreme Court, in a whole series of recent cases, and properly so, have been quite zealous in protecting the rights of indigent defendants against improper invasion. The defense is in no position, as is the prosecution, to induce witnesses to come to this country to testify. In this very case, the record shows that the public defender's office, with

its limited resources, did send an investigator to Mexico to try and induce the Mexican trial judge, and the Mexican investigating officers, to come to Los Angeles to testify, even offering to pay their expenses. The witnesses would not come. There was no way to compel them to come. But the prosecution could and did induce the two principals in the Mexican court to come to Los Angeles to testify. Thus, these biased witnesses, who could not convince a court in their own country, who were not believed when the facts were fresh in their minds, were permitted to testify as to the circumstances of the case, while the defense was required to rely on defendant's unsupported and uncorroborated denial of these circumstances. Thus, the rule, approved by the majority, results in a denial of due process and a denial of that fair trial guaranteed by the state and federal Constitutions.

I would send the case back for a retrial of the penalty issue.

Appellant's petition for a rehearing was denied August 14, 1963. Peters, J., was of the opinion that the petition should be granted.