[Crim. No. 12425. In Bank. June 20, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD VAUGHN, Defendant and Appellant.

Molly H. Minudri, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Roger E. Venturi, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—On December 29, 1967, the grand jury of Sacramento County indicted the defendant Edward Vaughn and one Ronald Lancaster for assaulting L. A. Bessette with a deadly weapon while defendant and Lancaster were serving life terms, in violation of section 4500 of the Penal Code.[1] Bessette suffered physical injuries. On May 7, 1968, the indictment against Ronald Lancaster was dismissed. At trial defendant requested that he be permitted to represent himself, and the trial court allowed him to do so. On the third day of the trial the defendant withdrew his plea of not guilty and pleaded guilty. The trial court then ordered a penalty trial. The jury returned a verdict of death. The appeal to this court was automatic. (Pen. Code, § 1239, subd. (b).) We explain why we have concluded that although the judgment should be affirmed as to guilt, it should be reversed as to penalty.

### The Facts

On December 29, 1967, defendant was confined at the California State Prison at Folsom for four offenses, each carrying a term of life imprisonment. At approximately 8 a.m. defendant and Lancaster jumped L. A. Bessette, a correctional officer. In the ensuing struggle Bessette suffered lacerations of the cheek and was subdued by the prisoners. Defendant, armed with a crude weapon fashioned by sharpening a sink plunger, threatened to kill Bessette unless he and Lancaster were given the keys to all the cells. The prison officials refused the request, and eventually defendant and Lancaster released Bessette and surrendered.

At the penalty trial the prosecution introduced evidence

---

[1] "Every person undergoing a life sentence in a state prison of this state, who, with malice aforethought, commits an assault upon the person of another, other than another inmate, with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death; however, in cases in which the person subjected to such assault does not die within a year and a day after such assault as a proximate result thereof, or the person so assaulted is another inmate, the punishment shall be death or imprisonment in the state prison for life without possibility of parole for nine years, at the discretion of the court or jury trying same, and the matter of punishment shall be determined as provided in Section 190.1 of this code. . . .

"Any person who, under this section, is punished by imprisonment rather than death, shall be required to serve his sentence consecutively to any sentence he is presently serving."

that the defendant had been convicted of three counts of first degree robbery and of second degree murder in the death of Conrad Becker, a fellow prisoner. The prosecution attempted to show that defendant was also guilty of first degree murder in the deaths of Benny Slankard and Delbert Blow, both fellow prisoners. Defendant had earlier been acquitted of the murder of Slankard, and had been convicted of assault with a deadly weapon upon Blow. Prison officials testified that defendant had broken prison rules in a number of instances, ranging from fighting and refusing work assignments to using offensive language towards officials. A state psychiatrist, Dr. Lowell Emmons, indicated that he had concluded, after a series of interviews with defendant, that the defendant felt no remorse for his crimes. The defendant offered evidence in an attempt to show that he had not killed either Slankard or Becker, and that he killed Blow only in self defense. Defendant also attempted to show that he had not committed two of the three first degree robberies of which he had been convicted.

*The trial court erroneously excused two veniremen for cause.*

The trial court excused for cause three prospective jurors because of their opposition to the death penalty.[2] One of these stated unequivocally that he would automatically vote against the death penalty no matter what the evidence produced at the trial might reveal. The remaining two, however, were stricken from the jury in violation of the mandate of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

The first juror excused for cause was Mrs. Ruth McClarin. When she indicated that she disapproved of the law permitting the death penalty, the trial court asked if she could nonetheless follow the law. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 514-515, fn. 7 [20 L.Ed 776, 780-781, 88 S.Ct. 1770].) Mrs. McClarin responded ambiguously, ''I would have a difficult time doing that. I am not sure whether I could in all cases.'' When asked whether her feelings would prevent her from choosing the death penalty, she stated, ''I am afraid they would.'' The response was unclear, since the juror's conjectures as to her possible future views and the

---

[2]The trial court also excused two prospective alternates, but this had no effect on the composition of the jury imposing the death penalty since the alternates selected never served on the jury.

juror's actual reaction on presentation of the facts might not have coincided. (Compare *People* v. *Durham* (1969) 70 Cal.2d 171, 199 [74 Cal.Rptr. 262, 449 P.2d 198]; see *People* v. *Osuna* (1969) 70 Cal.2d 759, 769 [76 Cal.Rptr. 462, 452 P.2d 678].)

Later Mrs. McClarin volunteered, "I really feel that I object so strongly that I couldn't consider the death penalty." (Compare *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 784, 88 S.Ct. 1770].) Mrs. McClarin, in qualifying her statement by the phrase "I feel" suggested that she might not be certain of her precise position. (Compare *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 55 [73 Cal.Rptr. 533, 447 P.2d 925]; *People* v. *Osuna, supra,* 70 Cal.2d 759, 769.) This uncertainty crystallized in her answer to the last question put to the prospective juror by the court. "THE COURT: Mrs. McClarin, would it be fair to say that under no circumstance would you impose the death penalty in any kind of a situation that could be brought before you? A. Not being able to think of enough cases, *I can't say for sure,* but I certainly can't think of any myself *right now* in which I could possibly impose a death penalty." (Italics added.)

As we said in *People* v. *Osuna, supra,* 70 Cal.2d 759, 769: "It is impossible to determine from this exchange whether the prospective juror believed . . . that her opposition to the death penalty would prevent her from voting for that penalty without regard to the evidence. Accordingly, she did not make 'unmistakably clear' . . . that she would automatically vote against the death penalty . . . ."

▇ The other juror erroneously excused for cause was Mrs. Betty Krokoski. The full text of the *voir dire* is set out in the margin.[3] Mrs. Krokoski indicated that she would try to

---

[3] "THE COURT: Do you know of any reason why you couldn't serve in this matter? . . .

". . . . . . . . .

"A. Well, I disprove [*sic*] of capital punishment.

"THE COURT: All right. You disprove [*sic*] of it, the statute of the State?

"A. Yes, I really do.

"THE COURT: Notwithstanding that, do you think you could follow the law?

"A. I would certainly try to, yes.

"THE COURT: Prosecution?

"VOIR DIRE EXAMINATION OF MRS. BETTY L. KROKOSKI BY G. NEIL TOCHER, Deputy District Attorney:

"Q. I take it you have given this some thought prior to even jury duty?

"A. Yes.

follow the law. (Compare *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 514-515, fn. 7 [20 L.Ed.2d 776, 780-781, 88 S.Ct. 1770].) When asked if she could impose the death penalty, Mrs. Krokoski twice indicated that she could do so if 'the

Q. And do you think where you'would be given a choice, just about in every case you would return a life imprisonment vote?

A. I am afraid I would, because I don't feel I have the right to take a life.

"Q. So, that would prevent you, then, from rendering a verdict for the death penalty?

"A. Gee, it would take an awful lot to—within myself to. be able to feel it was right.

"Q. Well, you understand if the trial gets to that phase you would· have a choice?

"A. Yes.

"Q. And the Judge isn't going to say if the evidence is so and so, you have to return a verdict, a certain verdict, you understand that?

"A. I am not exactly sure how that works.

"Q. Let me put it this way: If you are given a discretion after hearing all the evidence, do you think because of your feeling you would be inclined where there is a choice to return a verdict of life imprisonment?

"A. Yes, I do.

"Q. Would you do that in every case?

"A. I am not—this is where I would maybe—I am not quite sure on that, but I just really right—right now I can't see any instances where I could feel that I could take a life or give a verdict of, you know, give a verdict that would help to take a life.

"MR. TOCHER: In view of that, your Honor, I would make a motion to excuse for cause.

"THE COURT: You may ask her questions.

"VOIR DIRE EXAMINATION OF MRS. BETTY L. KROKOŞKI BY EDWARD VAUGHN, In Propria Persona:

"Q. On this call for the death penalty, you do not rule out that you could· bring in the death penalty if all the evidence was heavily strong against the defendant?

"A. It would have to be very, very heavy.

"Q. If it was all heavily strong against the defendant you could bring out the death penalty?

"A. I don't know. I have never been put in that position, and I am not sure that I could make a truthful answer to that.

"Q. I understand that.

"THE COURT: You must express yourself and indicate to us just what your state of mind is, so that the lawyers can properly evaluate it.

"A. Well, I am trying to. I have been sitting back there—

"THE COURT: I appreciate that.

"A. —fighting it out with myself, because I definitely do feel that I haven't the right to take a life.

"THE COURT: All right. But notwithstanding that, do you think you could consider imposition of the death penalty in any particular case if the Court were to permit you to exercise that discretion, should there have been a finding of guilt on the basic charge here, 4500 of the Penal Code?

"A. Well, as I say, right now I can't [see] myself making the death penalty.

"THE COURT: Can you say absolutely under no circumstance to this Court would you ever impose the death penalty, that you refuse to, because you have some conscientious objection to it? Now, if so, say so; and if not, why, indicate that.

"A. Well, I don't know whether I could go that far, your Honor. I

evidence supporting the death penalty were very great. She explicitly admitted on at least four occasions that she was not sure or did not know whether she would automatically vote against the death penalty. Her statements of opposition to the

---

mean, I am under oath, and I am not positive in my own mind. It is just something I can't see myself ever doing.

"THE COURT: Well, you have never been called upon to do it.

"A. I have never been called upon to do it.

"THE COURT: Do you know that you absolutely could not because of your opinion?

"A. I don't believe I could, sir.

"THE COURT: Further questions?

"MR. VAUGHN: Yes, sir.

"Q. (By Mr. Vaughn) If you were in the jury box during this case and all the evidence came in heavily against the defendant, if it did this and in your own mind you believed him to be guilty of the crime, could you bring in death?

"A. I don't believe I could, not death. Life imprisonment definitely, but I don't believe I could death.

"Q. You just said a while ago that if the evidence was heavy enough that you could bring in death, and now you—

"A. No, I said I couldn't see myself doing it.

"Q. But there is a chance that you could if it was heavy enough, that strong; would you turn down every case?

A. This is where—this is where I am not quite sure myself, because it would have to be an individual case, perhaps. I don't know. I don't want to say something I don't believe, and yet I don't think I ever would. I don't think I could ever bring in the death penalty.

"Q. I appreciate the fact that you don't want to say nothing that you don't believe. At the same time, when you say that you never would have and then turn around and say that you might—

"A. I say I don't believe I ever would.

"MR. VAUGHN: Your Honor, I object to her being excused.

"THE COURT: Would this opinion that you entertain affect your capacity to bring in a finding of guilt or innocence on that phase of the trial?

"A. No. No, I don't—

"THE COURT: Knowing that if you brought in a finding of guilt you would have to face up to assessing the penalty, whether it be life or death?

"A. I would have to do what my conscience told me in the life or death, but it would not—if I believed he was guilty, this I could bring in with no—

"THE COURT: Even if you had thereafter, by reason thereof, have to make the decision—

"A. Even if I had to make the decision afterwards, this would not bother me bringing in guilty or not guilty.

"THE COURT: Now, to clarify it, are you saying to the Court, then, under no circumstances could you ever bring in a death penalty?

"A. I can't—I can't quite make myself say, no, I would never, but I don't believe that I ever would. I mean, there is just that little bit of distinction, and I don't know how to get around it either way without maybe saying something that isn't quite right.

"THE COURT: You do not believe in it, correct?

"A. No, I do not believe in it.

"THE COURT: Is that founded on some religious belief?

"A. Well, I have read things in my church paper and papers.

"THE COURT: Do you belong to any organization that advocates

death penalty were hedged by phrases such as "I think," "I feel," "I believe," and "I am afraid." (See *People* v. *Durham, supra,* 70 Cal.2d 171, 199; *People* v. *Risenhoover, supra,* 70 Cal.2d 39, 55; *People* v. *Chacon* (1968) 69 Cal.2d 765, 772 [73 Cal.Rptr. 10, 447 P.2d 106].) Unlike the jurors excused in *People* v. *Beivelman* (1968) 70 Cal.2d 60, 78-79, footnote 4 [73 Cal.Rptr. 521, 447 P.2d 913], who were able to predict how they would vote in any case whatever, Mrs. Krokoski declined to predict what she might do in a situation other than those she hypothesized to herself during the *voir dire.* As of the moment she does not "believe" or "think" she would bring in a death penalty but she does not know, and will not state, that she would *never* bring in a death verdict. It "would take an awful lot to"; the evidence "would have to be very, very heavy." This clearly left open the possibility that in some case Mrs. Krokoski might impose the death penalty.

The equivocal statements of Mrs. Krokoski represent the kind of ambiguity that occurred in *People* v. *Risenhoover, supra,* 70 Cal.2d 39; there we stated the venireman's "conscientious opinion may have precluded her from concurring in such a verdict in the majority of cases but not have precluded her from concurring in such a verdict in all cases or in this case irrespective of the evidence that might be introduced at the trial. The court did not allow her to complete her answers, and her partial answers do not make it 'unmistakably clear' that she 'would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial. . . .' (*Witherspoon* v. *Illinois, supra* [1968] 391 U.S. 510, 522, fn. 22 [20 L.Ed.2d 776, 785].)" (70 Cal.2d at p. 56.) Having firmly declined to give the sort of "unambiguous yes or no answer" required by *Witherspoon* (*People* v. *Chacon, supra,* 69 Cal.2d 765, 772), Mrs. Krokoski was improperly excused.

---

against the death penalty law of this State?

"A. I don't believe the Presbyterian Church does. I think it does—it has come out with articles on it, but I don't believe it does. I am not positive on that, that they believe anything of that nature.

"THE COURT: Mr. Tocher?

"MR. TOCHER: I believe she stated that she doesn't believe she ever could, your Honor, on that basis would make an objection for cause.

"THE COURT: All right. Any other questions?

"MR. VAUGHN: Well, she testified when I questioned her that there is a chance that she could, and she could bring in a verdict of guilty. So, I object to her being excused.

"THE COURT: No, I will permit the challenge. You are excused. Thank you for being here today."

*Defendant's contentions that the trial court committed prejudicial error in giving certain instructions cannot stand.*

█ Defendant first complains of the definition of "malice aforethought" given by the trial court to the jury. When the trial court rendered the instruction defining malice aforethought, defendant had already pleaded guilty. Thus the instruction becomes significant only to the extent that it specified one of the elements of the crime, "with malice aforethought commit[ing] an assault upon the person of another . . . ," which defendant had already admitted.

The court stated, "Malice aforethought is manifested by the doing of an unlawful and felonious act intentionally, deliberately and without legal cause or excuse. It does not imply a pre-existing hatred or enmity towards the individual injured. The words 'malice aforethought' as used in Section 4500 of the Penal Code do not imply deliberation or the lapse of considerable time between the malicious intent to commit an assault and its actual execution but rather denote the purpose and design of the assaulting party in contradistinction to accident and mischance." The defendant contends that the jury should have been instructed that "malice aforethought" as used in section 4500 of the Penal Code conveys the same meaning as that in a case of murder. In particular defendant suggests the jury should have been told that the defendant, in admitting malice aforethought, acknowledged either that he intended unlawfully to kill Officer Bessette, that he assaulted Bessette with a base, antisocial motive wantonly disregarding the great danger to Bessette's life, or that he assaulted Bessette in the perpetration of a felony inherently dangerous to human life.

In view of defendant's guilty plea, his suggested instruction on malice could only have prejudiced him in the eyes of the jury. Under these circumstances we need not decide whether the trial court's definition of malice aforethought was either inadequate or erroneous.

█ The defendant also complains of the trial court's explanation of the possible sentences under section 4500 of the Penal Code. That section provides that if the jury returns a verdict of life imprisonment, the defendant must serve that sentence consecutively with any sentence he is presently serving and must serve at least nine years of that life sentence before being eligible for parole. Defendant notes that in explaining the crime described by section 4500 and in

instructing the jury on the possible verdicts the trial court failed to indicate that the life sentence without possibility of parole for nine years would be *consecutive* to any sentence the defendant was already serving. Under most circumstances an erroneous instruction concerning the possibility of parole warrants reversal of a verdict of death. (See *People* v. *Seiterle* (1961) 56 Cal.2d 320, 323-324 [14 Cal.Rptr. 681, 363 P.2d 913]; *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal. Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) In the instant case, however, only a few moments after the statements noted above, the trial court, in discussing the possibility of parole, explained that a life sentence must be served consecutively to any sentences the defendant was already serving. A trial court need not detail the entire content of a statutory provision upon every reference to it. Here the trial court's instructions adequately informed the jury of the consequences of a verdict of life imprisonment.

*Defendant's other contentions are without merit.*

 Defendant contends that to subject him to the death penalty for an assault which did not result in the death of the victim is to inflict cruel and unusual punishment upon him. We have long upheld section 4500 against this and related challenges to the penalty which it imposes. (*In re Wells* (1950) 35 Cal.2d 889, 895 [221 P.2d 947] (cruel and unusual punishment); *People* v. *Oppenheimer* (1969) 156 Cal. 733, 737 [106 P. 74] (cruel and unusual punishment); *People* v. *Jefferson* (1956) 47 Cal.2d 438, 444 [303 P.2d 1024] equal protection); *People* v. *Wells* (1949) 33 Cal.2d 330, 335 [202 P.2d 53] (equal protection).) These decisions do not necessarily settle the question for all time, however, since in applying the Eighth Amendment's ban on cruel and unusual punishment we must reflect ''the evolving standards of decency that mark the progress of a maturing society.'' (*Trop* v. *Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 642, 78 S.Ct. 590] (opn. of the Chief Justice), quoted with approval in *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 519, fn. 15 [20 L.Ed.2d 776, 783, 88 S.Ct. 1770].)

Defendant seems to suggest that the death penalty may be cruel and unusual under any circumstances whatever; we rejected this contention in *In re Anderson* (1968) 69 Cal.2d 613, 629-631 [73 Cal.Rptr. 21, 447 P.2d 117]. Defendant further argues that attacks by prisoners on guards or other prisoners are common, and that section 4500 lacks any substantial deterrent effect. These arguments might lead the

Legislature to call into question the wisdom of section 4500, but we do not in this case hold the section unconstitutional. (See *Trop* v. *Dulles, supra,* 356 U.S. 86, 100 [2 L.Ed.2d 630, 642, 78 S.Ct. 590] (opn. of the Chief Justice).)

Defendant further contends that he was unconstitutionally denied the assistance of counsel. Defendant concedes that, as we stated in *People* v. *Mattson* (1959) 51 Cal.2d 777, 788-789 [336 P.2d 937], "Except in certain situations not here pertinent, the court cannot force a competent defendant to be represented by an attorney." (Compare Cal. Const., art. I, § 13; Pen. Code, § 686.) In this case defendant insisted at the beginning of the proceedings that he did not wish to be represented by the public defender. At first the trial court refused to permit defendant to represent himself. When defendant persisted in this request, however, the court inquired extensively into his competence to waive counsel and to defend himself. Defendant stated that he had experienced three other prosecutions for violations of section 4500, that he had studied law in his cell, that he was familiar with some rules of evidence, and that he had begun preparation of the case. The public defender agreed to turn all of his legal notes over to the defendant. Under these circumstances the trial court did not abuse its discretion in granting defendant's request that he be allowed to represent himself.

Defendant complains that he was forced to dismiss the public defender as his attorney because defendant disagreed with him on the handling of the case. Defendant insists that he was entitled to the appointment of another attorney who would handle the case in the manner of defendant's preference. This contention has been considered and rejected in a number of decisions.

In *People* v. *Nailor* (1966) 240 Cal.App.2d 489, 494 [49 Cal.Rptr. 616], for example, the court stated, "It is now argued that the refusal of the public defender to make the 995 motion and of the court to appoint another public defender deprived defendant of his right to counsel. It is pointed out that if defendant were rich and his attorney refused to make such a motion, he could always hire another attorney. The argument misses the point: there is no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims. (*People* v. *Mattson,* 51 Cal.2d 777, 793 [336 P.2d 937]; *In re Atchley,* 48 Cal.2d 408, 418-419 [310 P.2d 15].) The ability of a rich client to change attorneys like shirts when they refuse to do his bidding is not necessarily an advantage. Until the con-

trary is proved we will continue to believe that a member of the legal profession knows better how to conduct a lawsuit than his lay client.'' The trial court, of course, retains discretion to substitute a new attorney whenever that will ''best promote [the] orderly, prompt and just disposition of the cause.'' (See *People* v. *Mattson, supra,* 51 Cal.2d 777, 797.) Nothing in the record indicates, however, that the trial court here abused its discretion in failing to offer defendant a new attorney.

▉ Although conceding that the public defender acted as his advisor until his plea of guilty, and that the trial court ''gave much assistance'' to him throughout the trial, defendant contends that he so ineffectively conducted his own defense as to reduce the trial to a sham. Defendant points to instances in which he asserts that an attorney would have acted more wisely and with greater effect. Yet, before permitting defendant to dismiss the public defender and represent himself, the trial court warned defendant of precisely this danger. Under the circumstances defendant cannot complain because his decision to represent himself proved to be unfortunate. The record does not indicate that defendant's conduct of the defense was so inept as to reduce the trial to a sham or farce, nor does it suggest that the prosecution took undue advantage of the absence of counsel.

▉ Defendant also objects to the admission by the trial court of a 30-page document admittedly written by defendant and purporting to describe a number of crimes committed by the author, including two murders. Defendant contends that since he had been acquitted of one of the murders, the prosecution should not have been permitted to attempt to prove that he had in fact committed that crime. We have repeatedly held, however, that ''if evidence of another offense is otherwise admissible, the fact that the defendant was acquitted does not render the evidence inadmissible.'' (*People* v. *Griffin* (1963) 60 Cal.2d 182, 191 [32 Cal.Rptr. 24, 383 P.2d 432] (and cases cited).) ▉ Defendant further complains that the trial court failed to instruct the jury that the prosecution and defense had stipulated that the document had been written as fiction. The stipulation in question reached only to the fact that defendant did not admit the truth of the writing; the court so cautioned the jury before parts of the writing were read by the prosecution.

Defendant complains, finally, of certain allegedly inaccurate statements contained in the prosecution's closing argument. ▉ The district attorney contended that defendant

was guilty of first degree murder in the killings of Benny Slankard, Delbert Blow, and Conrad Becker, although in fact defendant had been acquitted of first degree murder in the first two cases and had pleaded guilty to second degree murder in the third. The prosecutor's statements rested upon reasonable inferences from the evidence that were not foreclosed by the acquittals. (*People* v. *Griffin, supra,* 60 Cal.2d 182, 191.)

■ The prosecutor urged that it was defendant who seriously injured Officer Bessette; this inference reasonably arose from the testimony of Lancaster that only he and defendant fought Bessette, and that he, Lancaster, never hit Bessette. Bessette's testimony, although somewhat unclear, seemed to indicate that it was Lancaster rather than defendant who injured Bessette; the prosecution could permissibly ask that the jury credit Lancaster's testimony instead of Bessette's.

■ Further, defendant claims that the prosecutor erroneously suggested that the psychiatrist who examined defendant, a Dr. Emmons, concluded that defendant showed no remorse about his crimes. In fact the prosecutor did no more than quote with accuracy Dr. Emmon's testimony, which clearly indicated that defendant had shown no remorse.

■ The prosecutor did erroneously state that one of defendant's alleged victims, Conrad Becker, had been armed with a pair of shears at the time of his death. Apparently the shears were in the hands of an alleged accomplice of defendant, one Red Fenton. This error could only have benefited defendant, however, since it conjured up a vision of an armed adversary rather than an attack by two armed men upon a helpless victim.

■ Finally, defendant complains that the prosecutor argued that the defendant was serving four life terms, none of them for the death of any of the people he had killed. In fact one of those life terms had been imposed for the second degree murder of Conrad Becker. Early in the trial an employee of the Department of Corrections had testified that one of defendant's life terms was for second degree murder; the People introduced as one of its exhibits a copy of the commitment for second degree murder. The prosecutor made this erroneous statement while arguing that a life sentence in this case would not greatly affect defendant since he was already serving four other life terms. Thus the misstatement did not relate to the prosecutor's main line of argument. The prosecutor's error, moreover, if noted by the jury, may well have benefited defendant, since the jury might have inferred from the statement that the state had never been able to con-

vict defendant of any of the killings with which the People had charged him. Under these circumstances the two errors with regard to the Becker killing did not constitute "substantial error" requiring reversal of the penalty trial under *People* v. *Hines* (1964) 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398].

*An instruction forbidding the jury to be governed by "sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" should not be given*

The defendant contends that the trial court erred in instructing the jury that "the law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." We have repeatedly held that the jury may in its discretion entertain pity or sympathy for the defendant, and that the court should not render a contrary instruction. (*People* v. *Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641]; see *People* v. *Friend* (1957) 47 Cal.2d 749, 767-768 [306 P.2d 463]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 641-642 [51 Cal.Rptr. 238, 414 P.2d 366].)

The People suggest that the trial court's instruction that the law provides no standards for determining the appropriate penalty cures this error. Although the instruction on standards and the instruction on sympathy are plainly inconsistent, the jury might resolve that inconsistency by concluding that the restriction on sympathy served as an exception to their otherwise unlimited discretion; hence the instruction forbidding the named considerations must cause confusion.

We need not decide, however, whether the erroneous instruction as to pity and sympathy constituted "substantial error" requiring reversal (see *People* v. *Hines, supra,* 61 Cal.2d 164, 169), since we have already concluded that the penalty trial must be reversed on *Witherspoon* grounds.

The judgment is reversed insofar as it relates to penalty. In all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., Mosk, J., and Sullivan, J., concurred.

BURKE, J.—Finding no error under *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], I dissent from the reversal as to penalty. In all other respects I concur.

McComb, J., concurred.