[Crim. No. 8101. Third Dist. Mar. 8, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES GARDNER, Defendant and Appellant.

## COUNSEL

Thomas H. Frankel for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Daniel T. Dauenhauer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PARAS, J.**—Defendant appeals from convictions of assault with a deadly weapon by a life prisoner (Pen. Code, § 4500) and possession of a sharp instrument while a prisoner in a state prison (Pen. Code, § 4502).

On August 7, 1973, defendant was an inmate at Deuel Vocational Institution (at Tracy, California) serving a life sentence after conviction of first degree murder. He was housed in a maximum security area and restricted to his cell. Shortly after lunch, as the guards were collecting the serving trays from the cells, he called Officer Peoples to his cell and asked him to give a leftover orange to another inmate across the hall. As Peoples reached for the orange, defendant lunged at him through the bars with a sharpened metal object, stabbing him below the right armpit. Peoples was hospitalized for two days and off work for approximately four weeks.

Defendant admitted the offense in his trial testimony and stated that he considered himself a revolutionary; he explained that he stabbed Officer Peoples to commemorate the George Jackson shootout at San Quentin in 1970 and to show his solidarity with the Black Guerrilla Family, a prisoner organization. He added that if Officer Peoples had not been on duty that day, he would have stabbed any other available white correctional officer.

Four contentions are made on appeal:

(1) The mandatory sentence of imprisonment for life without possibility of parole for nine years (Pen. Code, § 4500) violates article I, section 6 of the California Constitution and the Eighth and Fourteenth Amendments of the United States Constitution which prohibit cruel and unusual punishment.

(2) California Penal Code section 4500 constitutes punishment for status and is thus unconstitutional.

(3) Statements by witness Hays concerning unproven prior assaults by defendant were improper and highly prejudicial.

(4) Certain bloodstained articles of clothing were erroneously admitted into evidence for the purpose of shocking the jury.

Finding the contentions to be without merit, we shall affirm.

## I

Penal Code section 4500 reads in part: "Every person undergoing a life sentence in a state prison of this state, who, with malice aforethought, commits an assault upon the person of another, other than another inmate, with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death; however, in cases in which the person subjected to such assault does not die within a year and a day after such assault as a proximate result thereof, or the person so assaulted is another inmate, the punishment shall be imprisonment in the state prison for life without the possibility of parole for nine years."

The California Supreme Court in *In re Lynch* (1972) 8 Cal.3d 410, 420-424 [105 Cal.Rptr. 217, 503 P.2d 921], *People* v. *Wingo* (1975) 14 Cal.3d 169, 175 [121 Cal.Rptr. 97, 534 P.2d 1001], and *In re Foss* (1974) 10 Cal.3d 910, 919-920 [112 Cal.Rptr. 649, 519 P.2d 1073], established three distinct criteria for determining whether a punishment is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id.,* at p. 424.) The first involves an examination of the nature of the offense and/or the offender, with particular regard to the degree of danger present to society. Relevant to this inquiry are (1) the facts of the crime in question, (2) the nonviolent nature of the offense, (3) whether there are rational gradations of culpability that can be made on the basis of the injury to the victim or to society in general, and (4) the penological purposes of the prescribed punishment. (*In re Lynch, supra,* at pp. 425-426; *In re Foss, supra,* at pp. 919-920; *People* v. *Wingo, supra,* at p. 176.)

The second criterion involves a comparison of the questioned punishment with punishments imposed by California for offenses deemed more serious. The court in *Lynch* stated that the underlying assumption behind this test "appears to be that although isolated excessive penalties may occasionally be enacted, e.g., through 'honest zeal' (*Weems* v. *United States* (1910) . . . 217 U.S. 349, 373 . . .) generated in response to transitory public emotion, the Legislature may be depended upon to act with due and deliberate regard for constitutional restraints in prescribing the vast majority of punishments set forth in our statutes. The latter may therefore be deemed illustrative of constitutionally permissible degrees of severity; and if among them are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect." (*In re Lynch, supra,* at p. 426.)

The third criterion involves a comparison of the challenged penalty with punishments prescribed in other jurisdictions for the same offense. The assumption is that "the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." (*In re Lynch, supra,* at p. 427.)

We have in mind, however, that *Lynch* stressed that these criteria are not intended as absolute rules of law to be blindly followed by the courts, but are merely guides for testing the validity of the punishment. (*In re Jones* (1973) 35 Cal.App.3d 531, 541 [110 Cal.Rptr. 765]; *People* v. *Serna* (1975) 44 Cal.App.3d 717 [118 Cal.Rptr. 904].) The *Lynch* court made it clear that it did not give the judicial branch *carte blanche* to rewrite the penalty aspects of our penal laws; in that regard, it emphasized several points or guidelines: (1) "The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. *The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense'* [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (Italics added.) (*In re Lynch, supra,* pp. 423-424.) (2) While the courts act as the final arbiters in deciding whether a punishment exceeds constitutional limitations, it is the function of the Legislature to define crimes and prescribe punish-

ments, and the Legislature must be accorded " 'the broadest discretion possible' " in this regard. (*In re Lynch, supra,* p. 414.) (3) ". . . ' "mere doubt does not afford sufficient reason for a judicial declaration of invalidity. *Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably. appears."* ' " (Italics added.) (*Id.,* at pp. 414-415, quoting from *In re Dennis M.,* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]; see also *People* v. *Wingo, supra,* 14 Cal.3d at p. 174.)

## A

Defendant does not argue that assault with a deadly weapon with malice aforethought upon prison personnel is not serious and dangerous. Rather he contends that the offense presents no danger to the *world outside,* and hence is not within the contemplation of the first *Lynch* criterion. This contention is distressingly inappropriate. The danger to society of which *Lynch* speaks must be taken in context. The fact that a prison society is a *closed* society does not make its temporary occupants unworthy of protection from assaults. A correctional officer does not cease to be a member of society when he steps within the prison walls, nor do visitors to the prison, such as lawyers, public officials, and relatives of inmates. Defendant, however, concentrates his attention on the nature of the *offender* rather than the victim. He excuses his conduct on the ground that "It is well known that prison life breeds emotions and conduct which prisoners would not normally engage in if outside prison walls," citing various psychological studies of the effects of imprisonment[1] which raise questions about the relative desirability of imprisonment as a sanction in light of certain undesirable side effects.

Defendant's position in this regard finds some support in the record by Dr. Freeman Adams, a private psychiatrist who examined the defendant and testified at the trial. On cross-examination by the district attorney, he stated:

"A. [I] think if you're in K-Wing very long you've got about two choices. You can either fight the system which means you have become assaultive, or you can give up and become psychotic or depressed or suicide. . . .

---

[1]Menninger, The Crime of Punishment (1966); Cohen & Taylor, Psychological Survival (1972); Lyle & Horner, Behavioral Science and Modern Penology (1973).

"Q. *What about the choice of conforming to the rules of the institution?*

"A. Well, if you have problems in that area and this is the end of the road, I mean you can't go any farther, and what else can they do to you. If you're a protesting person who has tremendous authority problems . . . ." (Italics added.)

The doctor testified in support of defendant's diminished capacity defense, which lacked merit because the true import of such testimony is that the defendant *chose* to become assaultive rather than to either conform or go mad. The doctor's assertion that the choice of conforming to the rules was not open to defendant because he is "a protesting person who has tremendous authority problems" does not describe defendant's *inability* to conform but his *determination to not conform.*

The crux of the contention is not that imprisonment is unjust, but that it is ineffective, or even counterproductive, when imposed upon one who, like defendant, (1) refuses to pursue his life without inflicting criminal injury upon others and (2) resents and rebels against punishment for his misconduct; he is therefore prepared to protest such punishment by committing vicious and unprovoked assaults upon innocent persons, for which he then defiantly asserts there should be no penalty.[2] A logical extension of this contention demonstrates its fallacy: No punishment or restraint can be effective as to such a person, for he will not be deterred. Since punishment is thus ineffectual, it is cruel and unusual. Society should therefore engage in no act of recrimination and the offender should be left undisturbed. Since a prison inmate has of course no monopolistic right to such inaction by society, the same "hands off" rule should apply to the misconduct of all incorrigible criminals, in or out of prison. Punishment of noninmate miscreants then is also cruel and unusual, and hence unconstitutional. Therefore no punishment should ever be imposed upon any criminals who resent punishment; society should just accept and tolerate their criminality. The *reductio ad absurdum* is complete.

There may be those who, in the name of compassion, would accept this argument. We do not.

The argument is inter alia tautologous: tremendous authority problems force a criminal to become assaultive because assaultive men have

---

[2]"Must I give way and room to your rash choler? Shall I be frighted, when a madman stares?" (Shakespeare, Julius Caesar, Act IV, Scene 3.)

tremendous authority problems. Psychiatrists who support such reasoning, along with its ultimate consequences, do no service to society or to themselves. By furnishing to a repeat offender such an unworthy (yet to the offender plausible) rationalization for his continued criminality, they also do a disservice to him.

The contention presupposes that (1) punishment will not deter the punishment-resenting offender, and (2) that deterrence is the sole objective of punishment. Whether in an individual case punishment actually deters or not is unimportant. As a general proposition, it does deter, both by preventing one who is aware of a preordained punishment from doing the act which brings it upon him and also by making an example of the offender for the sake of others. And even if it did not deter at all, deterrence is not punishment's only valid objective. The law recognizes others. The safety of society by isolation of the offender is one; retribution is another.[3] Surely the life termer who displays depravity such as that shown by defendant herein cannot be expected to be less depraved outside the prison. Therefore, assurance of his incarceration for a substantial minimum number of years is, at the very least, appropriate.

Looking specifically at the four inquiries relevant to this first *Lynch* standard, we see in summary: (1) the facts of the crime in question reveal a malicious and unprovoked assault with a knife upon a correctional officer, resulting in a serious injury; (2) a violent offense; (3) statutory provision for a rational gradation in punishment, depending in part upon whether the victim recovers or dies as a result of the assault; and (4) the penological purposes of providing (a) additional isolation from society, for the latter's protection, (b) fundamental punishment for vicious and inexcusable misconduct, and (c) deterrence of such conduct by the same offender and by others.

---

[3]"Stern retribution, although it is no longer the prime purpose of the criminal law, may be a relevant factor in selecting punishment." (*People* v. *Brust* (1957) 47 Cal.2d 776, 791, fn. 8 [306 P.2d 480]; *People* v. *Friend* (1957) 47 Cal.2d 749, 766-767 [306 P.2d 463].) In view of the way society has of late been murdered, raped, robbed, burgled, kidnaped, looted, high-jacked, and otherwise feloniously abused with ever-increasing frequency by a crescendo of criminal conduct, in the face of the modern accent on rehabilitation and deterrence (see 2 Witkin, Cal. Crimes (1963) Objectives of Criminal Punishment, § 897, p. 851), a reemphasis on simple and instinctive retaliation may well be in order.

B

The second *Lynch* standard requires comparison of the questioned punishment with punishments imposed for offenses which may be deemed more serious.

By virtue of Penal Code section 669 (and the repeal of the former requirement in § 4500 that the sentence be consecutive), the nine years without possibility of parole is to be served concurrently with defendant's life sentence. The sole effect of the statute, therefore, is to remove parole discretion by the Adult Authority for nine years.

A person convicted of assault by poison with intent to kill is eligible for parole after three and one-half years. (Pen. Code, § 216.) A first degree murderer is eligible for parole after seven years. (Pen. Code, § 190.) We need go no further. These are penalties for first offenses. Second offenders are necessarily more culpable, and should be punished more severely. More to the point therefore is the habitual criminal statute, Penal Code section 644. Penal Code section 3047.5 provides for a nine-year minimum without parole for thrice-convicted felons under section 644.

Penal Code section 4500 provides a nine-year minimum for what is necessarily a second offense. It can only operate moreover when the first offense is an extremely serious felony, since it applies only to life prisoners. Absolute symmetry is not required, if the punishments are within a reasonable range of each other. Furthermore, the Legislature may properly consider that harsher penalties are necessary against prison inmates, to more effectively deter assaultive conduct by them.

C

A comparison of Penal Code section 4500 with the statutes of the other states reveals the following: (1) There are 17 states with statutes relating specifically to assaults by prisoners: Code of Alabama, Title 14, section 39; Arizona Revised Statutes, Title 13, section 250; Delaware Code, Title 11, section 1254(b); Florida Statutes, section 944.42; Maine Revised Statutes, Title 34, section 710; Laws of Massachusetts, Chapter 127, section 38B; Michigan Statutes, section 28.1029; Missouri Revised Statutes, section 216.460; Revised Statutes of Nebraska, section 28-743; New Mexico Statutes, section 40A-22-16; Pennsylvania Statutes, 18 C.P.S.A. section 2704; General Laws of Rhode Island section 11-5-8;

Tennessee Code, section 41-710; Utah Code, section 76-7-12; Vermont Statutes, section 28-209; Code of Virginia, section 18.2-55, and Wisconsin Statutes, section 946.43. (2) Of these 17 states, Utah's statute alone is confined to the narrow range of behavior proscribed by section 4500 (malice aforethought with the use of a deadly weapon or means of force likely to produce great bodily injury, by an inmate serving a life sentence), while (a) only Alabama, Arizona, Pennsylvania and Maine make a distinction between life prisoners and others, and (b) only Arizona and Pennsylvania require the use of a deadly weapon or force likely to produce great bodily injury. (3) In the statutes of Alabama, Arizona, Pennsylvania, Maine and Utah, the punishment is (a) death in Alabama, (b) death in Arizona, (c) confinement to hard labor for any term of years in Maine, to commence after the completion of the former sentence—or in case of a prior life sentence, to commence at the completion of 30 years of such life sentence, (d) not more than 20 years in Pennsylvania (18 C.P.S.A., § 1103), and (e) death in Utah. (4) In the remaining 12 states the crime includes assault by any inmate upon a guard or employee; and in those states the punishment ranges from solitary confinement at the warden's discretion in Vermont to an indeterminate sentence with a maximum term of 15 years in Florida. The rest of the states either have general statutes proscribing assault with a deadly weapon on public officers or general assault statutes.

As noted, there are only four states with statutes at all similar to California Penal Code section 4500 (Utah, Arizona, Alabama and Pennsylvania), so as to be comparable for *Lynch* purposes. They show California to be comparatively lenient on this subject.

Reviewed by any or all of the *Lynch* standards, Penal Code section 4500 is constitutional.

## II

■ Defendant's second contention is that section 4500 constitutes punishment for his status as a life termer, and is for that reason cruel and unusual, citing *Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417]. The argument is specious. Defendant is being punished for his *acts,* not his status. He is being punished for his criminal *act* of assaulting a correctional officer, after having been imprisoned for his criminal *act* which resulted in a life sentence.

Actually, defendant claims that there is no *rational* basis for singling out life termers, thus addressing himself to the question of substantive due process. He argues that Department of Corrections statistics give no basis for believing that life termers constitute a distinctly more dangerous class than other life prisoners. Relying upon one report of the department,[4] plaintiff points out that presently most stabbing incidents are caused by individuals with a history of aggressive offenses, of Mexican-American ethnic background, *who are younger and had no prior prison experience but a history of jail or juvenile commitments.*

Far from showing that assaults by life prisoners are not a problem, however, this information is equally capable of the inference that such assaults are effectively deterred by section 4500. Additionally, the statutory distinction between convicts serving life sentences and convicts serving lesser terms established by sections 4500 and 4501 has consistently been held constitutional, based upon valid and necessary policy grounds. (*People* v. *Vaughn* (1969) 71 Cal.2d 406, 418 [78 Cal.Rptr. 186, 455 P.2d 122], revd. (1973) 9 Cal.3d 321 [107 Cal.Rptr. 318, 508 P.2d 318]; *People* v. *Wells* (1949) 33 Cal.2d 330, 335-337 [202 P.2d 53]; *In re Quinn* (1945) 25 Cal.2d 799, 802 [154 P.2d 875]; *People* v. *Finley* (1908) 153 Cal. 59, 62 [94 P. 248], affd. by *Finley* v. *California* (1911) 222 U.S. 28 [56 L.Ed. 75, 32 S.Ct. 13].)

### III

Defendant's third contention is that the receipt of statements by the witness Hays concerning an unproven prior assault at San Quentin was improper and highly prejudicial.

The statement of which defendant complains was as follows:

"Q. (Mrs. Ferrill) [the prosecutor]: Was there anything in Mr. Gardner's past that gave an indication that he might possibly be assaultive?

"A. Yes, there were.

"Q. And what, if anything, was that?

---

[4]Dated May 1974, this report of the department's research division is titled: "Brief Analysis of Characteristics of Male Felon Inmates designated as Aggressors in Stabbing Incidents."

"A. I believe he was involved in an assault at San Quentin prior to being received at DVI."

Defendant failed to object to this testimony at trial and thus is precluded from raising the issue for the first time on appeal. (Evid. Code, § 353, subd. (a); *People* v. *Welch* (1972) 8 Cal.3d 106, 115 [104 Cal.Rptr. 217, 501 P.2d 225].)

Moreover, an objection would have been properly overruled. This testimony was not offered on the issue of whether or not defendant committed the assault; defendant himself admitted it. The testimony went to the question of why defendant was in the security wing of the prison. Defendant's counsel first raised this issue in his earlier cross-examination of Lieutenant Hays, suggesting through his questions that defendant was held in protective custody because of threats against him by other inmates. It was important to defendant's diminished capacity defense to show that he developed assaultive behavior only *after* being placed under security conditions. But having thus opened the door, defendant made it permissible for the district attorney to rebut this suggestion that defendant was there only for his own protection. Additionally, defendant's counsel acquiesced in this line of questioning when on later recross-examination he inquired: "Q. Okay. Another item was you believed that Mr. Gardner was involved in an assault at San Quentin. I want to suggest to you the name of Mr. Sconyers, is that what we're talking about? A. I believe that's one, yes. Q. Sconyers was an inmate at San Quentin and somehow Sconyers got transferred to DVI and now Mr. Gardner and Sconyers are in the same institution, that was the situation that existed in '73? A. That was part of the situation, yes, sir."

## IV

Defendant contends that the admission of the victim's bloodstained clothing was improper for two reasons: (1) the nature and location of the wounds had previously been established by a photograph, and (2) the prosecution failed to establish that the stains were in fact blood.

During trial, defendant objected to the admission of the clothing on the basis that (1) the chain of custody was not sufficiently established, and (2) the spots on the clothing were not competently identified. Therefore, of the two grounds argued on appeal, the only one that may be properly reviewed is whether the clothing should not have been

admitted for lack of competent identification. (Evid. Code, § 353, subd. (a); *People* v. *Peters* (1972) 23 Cal.App.3d 522, 529 [101 Cal.Rptr. 403].)

Lieutenant Hays testified that he removed the shirt from Officer Peoples, and it remained in his custody in a locked box until the trial. The stains were not extensive. Given Officer Peoples' testimony that he had been stabbed under the armpit where the stains appeared, and defendant's own admission, it was unnecessary to have an expert identify the spots as blood.

The judgment is affirmed.

Janes, Acting P. J., and Evans, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 6, 1976.